

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-1-2008

# USA v. Wecht

Precedential or Non-Precedential: Precedential

Docket No. 07-4767

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"USA v. Wecht" (2008). *2008 Decisions.* Paper 608.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/608

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Case No: 07-4767

UNITED STATES OF AMERICA

v.

CYRIL H. WECHT

WPXI, Inc;
TRIBUNE-REVIEW PUBLISHING COMPANY;
PG PUBLISHING COMPANY
d/b/a Pittsburgh Post-Gazette,

Appellants

---

On Appeal from the United States District Court
for the Western District of Pennsylvania
District Judge: The Honorable Arthur J. Schwab
District Court No. 06-CR-26

---

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
January 8, 2008

1

Before: SMITH, FISHER, and VAN ANTWERPEN, *Circuit Judges*

(Filed: August 1, 2008  )

David J. Berardinelli
Walter P. DeForest, III
DeForest, Koscelnik, Yokitis, Kaplan & Berardinelli
436 Seventh Avenue
3000 Koppers Building
Pittsburgh, PA 15219
        *Counsel for WPXI, Inc.*

David A. Strassburger
Strassburger, McKenna, Gutnick & Potter, P.C.
444 Liberty Avenue
Suite 2200, Four Gateway Center
Pittsburgh, PA 15222
        *Counsel for Tribune Review Publishing Co.*

David J. Bird
W. Thomas McGough, Jr.
Joseph F. Rodkey, Jr.
Reed Smith LLP
435 Sixth Avenue
Pittsburgh, PA 15219
        *Counsel for PG Publishing Company*

Amy L. Barrette
Jerry S. McDevitt
Jagan N. Ranjan

Mark A. Rush
Kirkpatrick & Lockhart Preston Gates Ellis LLP
535 Smithfield Street
Henry W. Oliver Building
Pittsburgh, PA 15222

Richard L. Thornburgh
Kirkpatrick & Lockhart Preston Gates Ellis LLP
1735 New York Avenue, N.W.
Suite 500
Washington, D.C. 20006
       *Counsel for Cyril Wecht*

Rebecca R. Haywood
Office of United States Attorney
700 Grant Street
Suite 4000
Pittsburgh, PA 15219
       *Counsel for United States of America*

------

OPINION

------

SMITH, *Circuit Judge*.

I.

We issue this opinion in support of our order filed on

January 9, 2008 in the matter of *United States v. Wecht*. WPXI, Inc., PG Publishing Company, doing business as *Pittsburgh Post-Gazette*, and Tribune-Review Publishing Co. (collectively, the "Media-Intervenors"), filed a motion challenging an order of the United States District Court for the Western District of Pennsylvania announcing jury selection procedures to be used at an impending criminal trial. Specifically, the Media-Intervenors challenged the District Court's decisions (1) to empanel an anonymous trial jury, and (2) to conduct *voir dire* through use of a written questionnaire and without venirepersons physically present in an open courtroom until the pool of prospective jurors was reduced to 40. In our January 9 order, we vacated the District Court's order to the extent that it restricts public access to the names of trial jurors or prospective jurors.[1] We denied all other relief sought.

---

[1] Our order decreed that "juror and prospective jurors' names" shall be disclosed prior to the swearing and empanelment of the jury. The term "prospective juror" refers to a member of the venire. The term "juror" refers to a member of the venire who is chosen to be part of the actual trial jury. For the sake of clarity, this opinion will use the term "trial jurors" to describe people in the latter category. We also emphasize that, referring to the names of "juror[s] and prospective jurors," we anticipated that the District Court's disclosure would distinguish between the names of trial jurors and those of prospective jurors. It appears that in the disclosure that followed the entry of our order, the District Court did not make such a distinction. *See* Notice of Filing Prospective Juror List, *United States v.*

4

II.

On January 20, 2006, a grand jury returned an 84-count indictment against Dr. Cyril H. Wecht. As we noted in deciding an earlier interlocutory appeal in this matter, "[t]he 84-count indictment asserts that [Wecht] unlawfully used his public office as the coroner of Allegheny County, Pennsylvania, for private financial gain." *United States v. Wecht*, 484 F.3d 194, 198 (3d Cir. 2007). The offenses charged included theft of honest services, mail and wire fraud, and theft from an organization receiving federal funds. The case was assigned to Judge Arthur Schwab of the U.S. District Court for the Western District of Pennsylvania. During a pretrial conference on July 12, 2006, the parties reported to the District Court that they had agreed to use a 24-page questionnaire containing 69 questions in the jury selection process.[2]

The following day, on July 13, 2006, the Board of Judges

---

*Wecht*, No. 06-CR-26 (W.D. Pa. Jan. 23, 2008).

[2] In May of 2006, the Media-Intervenors moved to intervene in an effort to unseal certain court filings. In response to those motions, the Court unsealed certain documents. Wecht and the Government appealed several rulings, and Wecht filed a petition for mandamus seeking review of the District Court's denial of his motion to recuse. *See United States v. Wecht*, 484 F.3d 194 (3d Cir. 2007). Pretrial preparation proceeded in the District Court during the pendency of those appeals.

for the Western District of Pennsylvania entered an administrative order directing that "all jurors shall be identified in court during the jury selection process by his/her assigned juror number ONLY. A prospective juror shall no longer be identified by or identify himself or herself by name." *In re Jury Administration Procedures*, Misc. 06-211 (W.D. Pa. July 13, 2006). The order further provided that "any and all juror lists generated by this Court for use in the jury selection process shall be deemed confidential and property of the Court and shall not be removed from the Court at any time." *Id.* The juror lists were available only to counsel who were required to execute a receipt for the list and to return it upon completion of jury selection.

A day later, on July 14, Judge Schwab issued a pretrial order addressing the use of the jury questionnaire and establishing procedures to be employed during *voir dire*. Section A of the order noted that the summons to be issued to prospective jurors would be mailed together with the final juror questionnaire, a cover letter from the Court, and instructions. Section B of the order pertained to the jury questionnaire procedure. Paragraph 5 of Section B of the order stated: "Pursuant to the decision of the Board of Judges of this District, counsel shall not have access to the names and addresses of the prospective jurors. Therefore, Jury Administrator Morder is instructed to remove and retain the last page of the Jury Questionnaire setting forth the prospective jurors' names and current addresses." Although this directive was more restrictive

6

than the July 13, 2006 standing order, neither Wecht nor the Government objected. Paragraph 6 of Section B of the order scheduled a hearing for September 19, 2006, to permit counsel to review the completed jury questionnaires, albeit without the names and addresses of the jurors, and to confer among themselves as to prospective jurors that they did not believe should be part of the venire. Jury selection was scheduled for October 11, 2006.

In mid-September, after hearing oral arguments in the first Wecht appeal, this Court granted a stay of the trial pending its resolution of the various appeals. *United States v. Wecht*, No. 06-3098 (3d Cir. Sept. 15, 2006). As a result, the 300 venire members who had been summoned were released. After we issued our mandate, Judge Schwab entered an order on November 26, 2007, announcing the jury selection procedures he would follow. The order stated in the first paragraph that the "jury will be anonymous." The Court directed the jury administrator to issue 400 summonses. This time, however, the summons would not be accompanied by the juror questionnaire. Instead, the venire members would be called in groups of sixty to appear in the jury assembly room where they would receive the standard jury orientation and complete the jury questionnaire fashioned for this case. During the afternoon of each session, the jury administrator would provide four copies of the completed jury questionnaire to the District Court. The Court would then provide the questionnaire to counsel to review for the purpose of making challenges for cause and obtaining

7

information for peremptory challenges. The District Court instructed that it would rule on any challenges for cause each afternoon or the following morning. Final selection of the petit jury was tentatively scheduled to begin on January 23, 2008, during which the parties would exercise their peremptory challenges.

Wecht objected *inter alia* to jury anonymity, the limitation on access to the questionnaires, and the fact that the District Court's order did "not indicate whether the voir dire questions will be given to each group in open court or even at all prior to the for cause determinations . . . . " In a subsequent filing, Wecht objected to the removal of the signature page from the jury questionnaire and requested that each prospective juror be subject to voir dire in open court. On December 4, the Media-Intervenors filed a petition with the District Court objecting to the anonymous jury and the lack of in-person, public voir dire in open court.

On December 21, 2007, Judge Schwab issued a 64-page order reviewing the procedural history relative to jury selection and voir dire. Order of Court Re: Jury Selection, Voir Dire, And Other Pretrial Issues, No. 2:06-cr-00026-AJS (W.D. Pa. Dec. 21, 2007) ("Dec. 21 Order"). In this order, Judge Schwab reiterated his earlier declaration that the "jury will be anonymous," but

noted that he preferred the term "innominate jury."[3] Dec. 21 Order at 21 n.5. Additionally, Judge Schwab opined that the voir dire process would provide the parties with ample information about the jurors. Dec. 21 Order at 21 n.5. After setting forth the factors to be considered in deciding whether to empanel an anonymous jury, Judge Schwab adhered to his earlier ruling to empanel such a jury. Dec. 21 Order at 28–30. Noting that the Media-Intervenors had challenged the Board of Judges' order (Misc. 06-211) as unconstitutional, he disclaimed any reliance on this order as the basis of his decision. Dec. 21 Order at 18 n.4.

In his December 21 order, Judge Schwab also explained that "[t]he court will be reviewing the Jury Questionnaire in open court at the same time as counsel, so rulings may be made on the record, with media in attendance to hear the reason(s) for

---

[3] Judge Schwab provided two reasons for his preference for this term. First, he said that the term "anonymous" inappropriately connoted a "clandestine, forbidden, and obscure" jury panel. Dec. 21 Order at 21 n.5 (quoting *United States v. Carpa*, 271 F.3d 962, 963 n.1 (11th Cir. 2001)). Second, he suggested that the jury was not really anonymous because the parties knew everything about the jurors but their names. *Id.* (citing *United States v. Bowman*, 302 F.3d 1228, 1236 (11th Cir. 2002)). Judge Schwab nonetheless uses the terms "anonymous" and "innominate" interchangeably in his December 21 order. In this opinion, we will use the term "anonymous."

each 'for cause' dismissal, by juror number." Dec. 21 Order at 33. The order further noted that "the Court, as it always has done throughout this case, will provide the media access to the Courtroom during the six (6) day initial jury selection process (including all rulings on the record re: 'for cause' decisions); and during voir dire process of the pool of 40 jurors using the individual voir dire questions . . . ." Dec. 21 Order at 37.

Judge Schwab explained that "the final jury selection process will commence on January 23, 2008, and copies of the completed Jury Questionnaires of the pool of 40 prospective jurors will be returned only to the counsel, parties, and the Court (with a copy of the last page of the Jury Questionnaire identifying the names and addresses in order by juror number)." Dec. 21 Order at 44. During this final stage of the process, the District Judge noted that he would ask ten voir dire questions of each prospective juror. Dec. 21 Order at 40–41 (listing the questions). The order specified that the Media-Intervenors would, at the conclusion of the trial, be given access to review the jury questionnaire, excluding the last page which contained the juror's name and address. Dec. 21 Order at 34–35. The order contains no indication that the Media-Intervenors would be given access to the names or addresses of the prospective and trial jurors at any time before or after Wecht's trial.

The Media-Intervenors timely appealed the December 21 order. They moved for summary reversal under Third Circuit Internal Operating Procedure ("I.O.P.") 10.6 or, in the

10

alternative, for a stay of jury selection. *See* Media's Emergency Motion, United States v. Wecht, No. 07-4767 (3d Cir. Dec. 26, 2007).[4] The Government filed a response opposing the motion (Government's Response, United States v. Wecht, No. 07-4767 (3d Cir. Jan. 2, 2008)[5]), and Wecht filed a Response supporting it (Wecht's Response, United States v. Wecht, No. 07-4767 (3d Cir. Jan. 2, 2008)[6]). The motions panel referred the matter to a merits panel on January 2, 2008, deeming the parties' submissions on the motion to be their legal briefs and offering

---

[4] The full title of this application is "The Media's Emergency Motion For Summary Reversal Of The District Court's Order Dated December 21, 2007, Or, In The Alternative, Expedited Relief In The Form Of A Stay Of Jury Selection And Trial Proceedings Pending Disposition Of This Appeal."

[5] The full title is "Government's Response To The Media's Emergency Motion For Summary Reversal Of The District Court's Order Dated December 21, 2007, Or, In The Alternative, Expedited Relief In The Form Of A Stay Of Jury Selection And Trial Proceedings Pending Disposition [Of] This Appeal."

[6] The full title is "Cyril H. Wecht's Response To The Media's Emergency Motion For Summary Reversal Of The District Court's Order Dated December 21, 2007, Or, In The Alternative, Expedited Relief In The Form Of A Stay Of Jury Selection And Trial Proceedings Pending Disposition Of This Appeal."

the parties an opportunity to file supplemental briefs. *See* Order, *United States v. Wecht*, No. 07-4767 (3d Cir. Jan. 2, 2008). After the Media-Intervenors filed a Reply to the Government's Response (Media's Reply, United States v. Wecht, No. 07-4767 (3d Cir. Jan. 4, 2008)[7]), all of the parties submitted letters stating that they would rely on their previous filings as their briefs on the merits.[8] In an order filed on January 9, 2008, we declared that

> [t]o the extent that the District Court's order restricts access of Media Intervenor-Appellants and defense counsel to the names of prospective jurors who participate in the selection process prescribed by the District Court, those provisions

---

[7] The full title of the Media's Reply is "The Media's Reply in Support of Emergency Motion for Summary Reversal of the District Court's Order dated December 21, 2007, or, in the Alternative, Expedited Relief in the Form of a Stay of Jury Selection and Trial Proceedings Pending Disposition of this Appeal."

[8] The dissent argues that we would have benefitted from "additional briefing" given the fact that the parties' original filings focused on the Media-Intervenors' request for summary reversal or a stay. Dissent, *infra*, at 58 n.44. As noted above, we offered the parties an opportunity to file supplemental briefs after the matter was referred to a merits panel, and they chose to rely on their previous filings.

12

of the order are VACATED. We leave to the discretion of the District Court the method and timing of disclosure of juror and prospective jurors' names, except that disclosure of those names shall be made prior to the swearing and empanelment of that jury.[9]

Order, *United States v. Wecht*, No. 07-4767 (3d Cir. Jan. 9, 2008). We denied any other relief relative to the voir dire proceedings. *Id.* We denied the motion for a stay as moot because our order was issued prior to the commencement of trial. *Id.*

### III.

We have jurisdiction to review the Media-Intervenors' motion under 28 U.S.C. § 1291 and the "collateral order" doctrine.[10] *See Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S.

---

[9] We noted that Media-Intervenors were "not seeking access to the jurors' home addresses or the actual jury questionnaire." Order at 2 n.1, *United States v. Wecht*, No. 07-4767 (3d Cir. Jan. 9, 2008). For that reason, we do not address those issues here.

[10] In our January 9 order, we stated: "Appellate jurisdiction exists under the collateral order doctrine." Order at 2, *United States v. Wecht*, No. 07-4767 (3d Cir. Jan. 9, 2008) (citing *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541

541, 546–47 (1949). Under 28 U.S.C. § 1291, "[t]he courts of appeals . . . shall have jurisdiction of appeals from all final decisions" of district courts. Ordinarily, this rule "prohibits appellate review until conviction and imposition of sentence" in a criminal case. *Flanagan v. United States*, 465 U.S. 259, 263 (1984). The category of "final decisions" subject to appellate review under § 1291 also includes, however, "collateral orders" that (1) "conclusively determine the disputed question," (2) "resolve an important issue completely separate from the merits of the action," and (3) are "effectively unreviewable on appeal from a final judgment." *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468–69 (1978). When deciding whether an order is appealable as a collateral order under § 1291, we give this provision of the statute a "practical rather than a technical construction." *Cohen*, 337 U.S. at 546.

In *United States v. Schiavo*, we held that a District Court's order restricting the media from publishing certain information about a criminal trial was appealable under the collateral order doctrine because it "determined a matter independent of the issues to be resolved in the criminal proceeding itself, bound persons who were non-parties in the

---

(1949)). Our dissenting colleague now argues that the collateral order doctrine did not provide us with jurisdiction to hear this appeal. *See* Dissent, *infra*, at 2–19. We are surprised that he did not raise this purported jurisdictional defect in his dissent to our January 9 order.

14

underlying criminal proceeding and had a substantial, continuing effect on important rights." 504 F.2d 1, 4–5 (3d Cir. 1974) (en banc). In *United States v. Cianfrani*, we applied *Schiavo* to permit collateral order jurisdiction over the media's challenge to orders excluding the public and the press from a pretrial hearing and sealing the record. 573 F.2d 835, 845 (3d Cir. 1978) (citing *Schiavo*, 504 F.2d at 4). The Government has challenged our exercise of jurisdiction, relying in large part on *Flanagan*, in which the Supreme Court held that we must interpret the requirements of the collateral order doctrine "with the utmost strictness in criminal cases" because of "the compelling interest in prompt trials" and the delays that an appeal is likely to create.[11] 465 U.S. at 265. *Flanagan* instructs us to defer appeal until final judgment in a criminal case unless the matter involves "an asserted right the legal and practical value of which would be destroyed if it were not vindicated before trial." *Id.* at 266 (citations and internal quotation marks omitted). At the time *Flanagan* was decided, the Supreme Court had found only three types of pretrial orders to meet the requirements of the collateral order doctrine: (1) an order denying a motion to reduce bail; (2)

---

[11] We note that our decision to grant review in this case does not threaten "the compelling interest in prompt trials." 465 U.S. at 265. Because we declined to grant the media's request for a stay, and because releasing the jurors' names did not create a time-consuming burden for the District Court, our ruling has posed no danger to the interests of either Wecht or the public in a speedy trial.

15

an order denying a motion to dismiss an indictment on double jeopardy grounds; and (3) an order denying a motion to dismiss an indictment on speech or debate grounds. *Id.* at 265–66. In *Sell v. United States*, 539 U.S. 166, 176–77 (2003), the Court recognized that an order to forcibly medicate a defendant during trial also meets the requirements for collateral order jurisdiction. What these orders have in common is that neither an acquittal, a post-trial reversal of a conviction, nor any other result can adequately redress the harm that these orders cause. *See Flanagan*, 465 U.S. at 266–67. The Supreme Court has not addressed, post-*Flanagan*, whether a right of access claim raised by a media outlet in a criminal case would satisfy the collateral order doctrine.[12] The issue before us, therefore, is not only

---

[12] In *ABC, Inc. v. Stewart*, 360 F.3d 90 (2d Cir. 2004), the Second Circuit held that an order affecting the right of access in a criminal case was appealable under the collateral order doctrine. *Id.* at 97. Without mentioning *Flanagan*, the court deemed the order appealable for two reasons. First, the court said that the district court had "in effect allowed the Media Coalition to intervene in the pending criminal proceeding for the limited purpose of challenging" the order, and that the order was therefore final and appealable as to the intervenors. *Id.* (citing *In re Herald Co.*, 734 F.2d 93, 96 (2d Cir. 1984)). Second, the court said that because the Media Coalition's claims "could have been treated by the district court as a new civil case, as opposed to an intervention in the pending criminal case, and the orders would have been final in that case[,] [n]o jurisdictional significance should attach simply because the district court

16

whether the instant order would be appealable under the principles of *Schiavo* and *Cianfrani*, but also whether *Flanagan* has effectively overruled these cases.

Because *Flanagan* has its greatest impact on the third requirement of the collateral order doctrine (*i.e.*, that the decision must be "effectively unreviewable on appeal from a final judgment"), we address this requirement first. We conclude that it would be impossible for us to vindicate the public's asserted right of access if we foreclosed appeal of this matter until after the final judgment. As with the orders discussed in *Flanagan* and *Sell*, the potential harm caused by an improper order restricting the public's right of access to a criminal trial is not adequately redressable on appeal after final judgment, regardless of the trial's outcome. We have observed in similar cases that "contemporaneous review [of judicial proceedings] by the public 'is an effective restraint on possible abuse of judicial power.'" *United States v. Smith*, 787 F.2d 111, 113 (3d Cir. 1986) (quoting *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 596 (1980) (Brennan, J., concurring in the judgment)); *see also Republic of Philippines v. Westinghouse Elec. Corp.*, 949 F.2d 653, 660 (3d Cir. 1991); *United States v. Criden*, 648 F.2d 814, 821 (3d Cir. 1981). Knowledge of jurors' identities aids public review by enabling

---

chose to treat appellants as intervenors in the criminal proceeding." *Id.* (citing *In re New York Times Co.*, 828 F.2d 110, 113 (2d Cir. 1987)).

17

the public to "verify the impartiality of key participants in the administration of justice." *In re Globe Newspaper Co.*, 920 F.2d 88, 94 (1st Cir. 1990).

The Government argues that we can fully vindicate any such right via post-trial release of information, allowing us to defer review until the final judgment. Although post-trial release of information may be better than none at all, the value of the right of access would be seriously undermined if it could not be contemporaneous. *See, e.g.*, *Grove Fresh Distribs. v. Everfresh Juice Co.*, 24 F.3d 893, 897 (7th Cir. 1994) ("To delay or postpone disclosure undermines the benefit of public scrutiny and may have the same result as complete suppression."). We do not suggest, of course, that public disclosure of information related to judicial proceedings must always be contemporaneous, given the interests in security and the other grave concerns that might outweigh the right of access in a particular case. Indeed, "stronger reasons to withhold juror names and addresses will often exist *during* trial than *after* a verdict is rendered." *Globe Newspapers*, 920 F.2d at 91 (emphasis in original). But the value of contemporaneous disclosure, as opposed to post-trial disclosure, is significant enough to justify our immediate review of the matter under the collateral order doctrine. Accordingly, we decline to hold that *Flanagan* undermines our conclusion in *Schiavo* and *Cianfrani* that right of access claims are immediately appealable.

We turn now to the other requirements for application of

18

the collateral order doctrine. The first requirement is that the order must "conclusively determine the disputed question." *Coopers & Lybrand*, 437 U.S. at 468. We cannot review any decision that is "tentative, informal or incomplete." *Cohen*, 337 U.S. at 546. The District Court's December 21, 2007 order is a conclusive determination that the names of prospective jurors will not be available to the Media-Intervenors at any time before or after the trial and that *voir dire* will be conducted by written questionnaire until the pool of jurors is reduced to forty.[13] We reach this conclusion based on the fact that the 64-page order explicitly considers and rejects the Media-Intervenors' objections to this procedure. There is no reason to believe that any subsequent developments would have led the District Court to reconsider its conclusion.[14] The Government does not dispute

---

[13] The Dec. 21 Order does not explicitly address whether the venirepersons will be present when counsel reviews the jury questionnaire in open court.

[14] The dissent argues that the December 21 order was not final because if the Media-Intervenors or the defendant had petitioned for modification of the December 21 order, "they may well have been successful." Dissent, *infra*, at 9. Given the fact that the District Court had already considered and rejected their arguments, we find it unlikely that they could have achieved the desired modification by making these arguments again. Of course, it was theoretically possible that the District Court would have modified the December 21 order, either in response to a petition for modification or *sua sponte*. This possibility does not

19

that the District Court's order conclusively determined the question.[15]  *See* Government's Response at 8–9 ("the order regarding jury selection procedures may satisfy the first requirement of the collateral order doctrine, *i.e.*, conclusively determining the disputed question . . ."). Accordingly, we conclude that the District Court's order satisfies the first requirement of the collateral order doctrine.

The second requirement is that the order "resolve an important issue completely separate from the merits of the

---

eliminate finality, however, because the first requirement of the collateral order doctrine may be satisfied when "there is no basis to suppose that the District Judge contemplated any reconsideration of his decision." *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 12–13 (1983). Because the District Court's December 21 order indicates that it is intended to be the final word on the Media-Intervenors' objections, it was final for purposes of the collateral order doctrine.

[15] We recognize that the Government's failure to challenge the finality of the order is not dispositive, since it is always our duty to ensure that we are properly exercising jurisdiction. To the extent that the finality of the order is a factual issue, however, the Government may be in a better position than we are to evaluate whether the District Court would have considered a request for modification. Therefore, its decision not to challenge this requirement of the collateral order doctrine is notable.

20

action." *Coopers & Lybrand*, 437 U.S. at 468. This is sometimes divided into two sub-requirements: (a) the issue must be important; and (b) the issue must be completely separate from the merits of the action. The Supreme Court has defined an important issue as one involving interests that are "weightier than the societal interests advanced by the ordinary operation of final judgment principles," *Digital Equip. Corp. v. Desktop Direct*, 511 U.S. 863, 879 (1994), or one that is "serious and unsettled," *Cohen*, 337 U.S. at 547.[16] We believe that the question of when a district court may withhold the names of jurors and the content of *voir dire* proceedings from the public during a criminal trial is important enough to satisfy the first sub-requirement. The District Court's order implicates the public's right of access to judicial proceedings, which is a constitutional interest of sufficient weight to permit the possibility of departing from ordinary final judgment principles. Like the orders at issue in *Schiavo* and *Cianfrani*, the instant

---

[16] At times, courts have treated importance as a fully independent requirement of the collateral order doctrine. *See, e.g.*, *Nixon v. Fitzgerald*, 457 U.S. 731, 742 (1982) ("As an additional requirement, *Cohen* established that a collateral appeal of an interlocutory order must '[present] a serious and unsettled question.'" (quoting *Cohen*, 337 U.S. at 547)). The exact role of the importance requirement in the analysis has been the subject of debate. *See generally* 15A Charles Alan Wright, *et al.*, *Federal Practice and Procedure* § 3911.5 (2d ed. 1992).

21

order has "a substantial, continuing effect on important rights."[17] *See Cianfrani*, 573 F.2d at 845; *Schiavo*, 504 F.2d at 5. Moreover, as we make clear in our substantive discussion below, the precise question in this case is unsettled. Thus, the sub-requirement that the issue must be "important" is satisfied.

The issue is also completely separate from the merits of the action, *i.e.*, Wecht's guilt or innocence. We have repeatedly held that orders restricting public access to information are separate from the underlying issues in criminal trials. *See, e.g.*, *Cianfrani*, 573 F.2d at 841 (concluding that the media's appeal of an order barring the public from a pretrial suppression hearing and sealing the record of that hearing was separate from the merits of the underlying criminal proceeding); *Schiavo*, 504 F.2d at 5 (concluding that an order purporting to enjoin newspapers from publishing information "determined a matter

_____

[17] In a footnote, the Government "questions the importance of the Media's ability to write articles that include jurors' names as opposed to articles without them." *See* Government's Response at 9 n.6. As we explain below, however, the release of juror names can be an important part of the public's right of access. In the words of the First Circuit in *In re Globe Newspaper Co.*, "[k]nowledge of juror identities allows the public to verify the impartiality of key participants in the administration of justice, and thereby ensures fairness, the appearance of fairness and public confidence in that system." 920 F.2d 88, 94 (1st Cir. 1990).

22

independent of the issues to be resolved in the criminal proceeding itself"). The Government objects that the anonymity of the jury is "intimately tied to the merits" because "the jury is the entity that will decide the ultimate issues of guilt or innocence in this case." Government's Response at 9. But the relevant question is whether the issues presented in the Media-Intervenors' right of access claim are tied to Wecht's guilt or innocence, not whether the appealed issue and the merits involve the same "entity." In *Sell v. United States*, the Supreme Court found that the issue of whether the defendant must be forcibly medicated in order to stand trial was separate from the merits, even though the District Court had found that the medication served "the government's compelling interest in obtaining an adjudication of defendant's guilt or innocence." 539 U.S. 166, 174–76 (2003); *see also* 539 U.S. at 192 (Scalia, J., dissenting) (agreeing that the medication order resolved "an important issue separate from the merits" despite concluding that the order did not satisfy the third prong). Similarly, in this case, the District Judge may have believed that establishing jury anonymity would aid the determination of guilt or innocence, but the anonymity issue is nonetheless separate from any issue presented by the merits. Thus, we believe that the sub-requirement that the issue be "completely separate from the merits of the action" is satisfied in this case.[18]

---

[18] The Government cites several cases in support of a contrary conclusion. First, it cites *Sell* for the proposition that an issue satisfies the "completely separate" requirement only

23

The Government presents two additional challenges to our ability to hear this appeal. First, the Government argues that the media lacks standing because it "does not have a public right of access under the First Amendment or the common law to the jurors' names and/or the jurors' questionnaires" and thus suffered no "injury in fact." Government's Response at 11–12.

---

when it is separate "from questions concerning trial procedures." 539 U.S. at 176. *Sell* does not define a "trial procedure" or explain whether this means something different from being separate from the merits. In any case, we have discussed *Sell* above and concluded that it supports the conclusion that jury anonymity is completely separate from Wecht's guilt or innocence. Second, the Government cites *United States v. McVeigh*, 106 F.3d 325, 332 (10th Cir. 1997), which held that an order barring victim-impact witnesses from observing the guilt phase of a capital trial was not separate from the merits of the action. We decline to rely on *McVeigh*, however, because it interprets the Criminal Appeals Act, 18 U.S.C. § 3731, rather than the collateral order doctrine. 106 F.3d at 329; *see also id.* at 331 (". . . when the government seeks review in a criminal case, concerns unaddressed by *Cohen* come into play."). Third, the Government cites dicta from *United States v. Green*, 407 F.3d 434, 438 (1st Cir. 2005), which addresses the government's attempt to appeal from a pretrial order establishing two separate juries for guilt and sentencing. Like *McVeigh*, *Green* involves a government appeal in a criminal case, and thus would not be controlling even if it were a holding from our own circuit rather than dicta from another.

Because we conclude that the Media-Intervenors have a right to the jurors' names, for the reasons discussed below, we reject this argument and conclude that the Media-Intervenors have standing.[19] The Media-Intervenors do not have standing, however, to challenge directly the constitutionality of the Board of Judges' order (Misc. 06-211), because the District Court did not rely on this as a basis for its decision.[20] *See* Dec. 21 Order at 18 n.4. Second, the Government argues that as a prudential matter, we should dismiss the Media-Intervenors' appeal as

---

[19] Contrary to the Government's suggestion, the Media-Intervenors are not seeking access to the questionnaires, so we need not consider whether they have a "right" to access them for standing purposes. Pursuant to *Press-Enterprise I*, the Media-Intervenors have at least a presumptive right of access to *voir dire* proceedings, so we conclude that they have standing to the extent that they claim that they challenge the District Court's *voir dire* rulings on right of access grounds.

[20] The District Court states later in its order that "in accordance with Misc. Rule 06-211, the Court (and no counsel or party) will neither read nor state the names or addresses of prospective jurors in open court, nor will they provide the media or any person or party access to the names or addresses of the prospective or empaneled jurors." Dec. 21 Order at 37. Despite this, it appears that the District Court did not *rely* on Misc. 06-211 even if it might have acted "in accordance with" it. Thus, we will not consider the constitutionality of Misc. 06-211 in our evaluation of the District Court's order.

25

untimely because they did not appeal until December 2007, shortly before trial was scheduled to begin in January 2008. Government's Response at 12–13. The Government asserts that the District Court had made its intention to establish an anonymous jury clear in July 2006, one-and-a-half years before the Media-Intervenors appealed. The Media-Intervenors respond that the July 2006 order did not clearly establish that the jury would be anonymous, and in any event was not a final order since it explicitly indicated that it was subject to modification. Media's Emergency Motion at 6–7. Because the media acts as a surrogate for the public in asserting a right of access, *see Richmond Newspapers v. Virginia*, 448 U.S. 555, 572 (1980), we decline to reject the appeal even assuming *arguendo* that the Media-Intervenors were not diligent in asserting this right.

IV.

The Media-Intervenors seek reversal of the order because it requires that the prospective and trial jurors be anonymous and because it creates a *voir dire* process that relies solely on written questionnaires without jurors being physically present in the courtroom prior to reduction of the venire to a pool of forty. Because they rely primarily on arguments that the First Amendment creates a right of access that requires disclosure of jurors' names and the conducting of *voir dire* in open court,[21] we

---

[21] The Media-Intervenors also state that the common law or the Third Circuit's supervisory powers establish a right of

26

briefly review the right of access jurisprudence of the Supreme Court and our court.

In *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980), the Supreme Court[22] held that "the right to attend criminal trials is implicit in the guarantees of the First Amendment" because "without the freedom to attend such trials, which people have exercised for centuries, important aspects of freedom of speech and 'of the press could be eviscerated.'" 448 U.S. at 580 (quoting *Branzburg v. Hayes*, 408 U.S. 665, 681

access to criminal proceedings that includes disclosure of the jurors' names and voir dire in open court. Media's Emergency Motion at 10–11 (citing *In Re The Baltimore Sun Co.*, 841 F.2d 74 (4th Cir. 1988) (common law); *United States v. Criden*, 675 F.2d 550 (3d Cir. 1982) (supervisory powers)). They do not, however, make a serious effort to develop these alternative grounds for a right of access aside from their citations to these cases. Thus, we will focus only on their argument that a right of access exists under the First Amendment.

[22] Although no opinion in *Richmond Newspapers* commanded a majority, seven of the eight justices who participated in the case recognized that the First Amendment embodies a right to attend criminal trials. *See* 448 U.S. at 558–81 (plurality opinion); *id.* at 584–98 (Brennan, J., concurring in judgment); *id.* at 598–601 (Stewart, J., concurring in judgment); *id.* at 601–04 (Blackmun, J., concurring in judgment).

(1972)). The Court said that this right encompassed both a "right of access" and a "right to gather information," and that the media's right is no less important than that of the general public. *Id.* at 576–77 & n.12. In *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501 (1984) ("*Press-Enterprise I*"), the Supreme Court held that this right of access and to gather information applies to *voir dire* in criminal trials as well. 464 U.S. at 508. The Court explained that "[t]he presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest" and that "[t]he interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered." 464 U.S. at 510.

To determine what aspects of a criminal trial are subject to a presumptive right of public access under the First Amendment, the Court created the "experience and logic" test in *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 8–9 (1986) ("*Press-Enterprise II*"). This test requires courts to weigh two "complementary considerations." *Id.* at 8. Under the "experience" prong, a court considers "whether the place and process have historically been open to the press and general public." *Id.* Under the "logic" prong, a court considers "whether public access plays a significant positive role in the functioning of the particular process in question" by, *inter alia*, enhancing "both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the

28

system." *Id.* at 8–9 (citation omitted). If an aspect of a criminal trial "passes these tests of experience and logic, a qualified First Amendment right of public access attaches." *Id.* at 9–10. As *Press Enterprise I* made clear, even when such a right of access exists, it is merely presumptive and may be overcome if the District Court articulates specific facts that justify closure.

Whether there is a First Amendment right to have access to a particular aspect of a judicial proceeding is a question of law that we review *de novo*. *See United States v. Antar*, 38 F.3d 1348, 1356–57 (3d Cir. 1994). Outside of the First Amendment context, we use an abuse of discretion standard to review a District Court's decisions regarding jury anonymity, *United States v. Scarfo*, 850 F.2d 1015, 1023 (3d Cir. 1988), and its conduct of *voir dire*, *Butler v. City of Camden*, 352 F.3d 811, 815 (3d Cir. 2003).[23] To the extent that we consider whether the District Court has articulated findings sufficient to overcome a presumptive right of access under the First Amendment, however, we conduct "substantially broader" review that "includes independent consideration of the district court's order and the factual findings inferred from the evidence before it." *In re Capital Cities/ABC, Inc.*, 913 F.2d 89, 92 (3d Cir. 1990) (citing *Bose Corp. v. Consumers Union*, 466 U.S. 485, 499

---

[23] We point out that the First Amendment right of access that the Media-Intervenors assert is distinct from a defendant's Sixth Amendment right to challenge the use of an anonymous jury.

29

(1984); *New York Times Co. v. Sullivan*, 376 U.S. 254, 285 (1964)); *see also Antar*, 38 F.3d at 1357; *United States v. Smith*, 787 F.2d 111, 113 n.1 (3d Cir. 1986).

V.

The Media-Intervenors argue that the First Amendment requires disclosure of the jurors' names prior to empanelment of the jury in this case. This question is one of first impression in our circuit.[24] Following the framework established in *Press-*

_____

[24] Some have argued that the Supreme Court settled this question in *Press-Enterprise I* by implying that jurors' names are an inseparable component of *voir dire*. Discussing a potential conflict between the First Amendment presumption of openness for *voir dire*, and jurors' privacy interests, the Court said:

> When limited closure [of *voir dire*] is ordered, the constitutional values sought to be protected by holding open proceedings may be satisfied later by making a transcript of the closed proceedings available within a reasonable time, if the judge determines that disclosure can be accomplished while safeguarding the juror's valid privacy interests. Even then a valid privacy right may rise to a level that part of the transcript should be sealed, *or the name of a juror withheld*, to protect the person from embarrassment.

*Enterprise II*, we will examine first whether the "experience and logic" test supports a conclusion that the presumptive right of access to criminal proceedings includes a right of access to jurors' names. *See Press-Enterprise II*, 478 U.S. at 7–10. If so, we will examine whether this presumption of openness is overcome by particularized findings in the record "establishing the existence of a compelling government interest," and "demonstrating that absent limited restrictions on the right of access, that other interest would be substantially impaired." *Antar*, 38 F.3d at 1359 (citing *Press-Enterprise II*, 478 U.S. at 15).

## A.

The first question before us is whether the "experience

464 U.S. at 512 (emphasis added). Arguably, this passage can be "read to imply that jurors' identities are part and parcel of voir dire, and as such are governed by the same principles of presumptive access." *Beacon Journal v. Bond*, 781 N.E.2d 180, 192 (Ohio 2002) (quoting David Weinstein, *Protecting a Juror's Right to Privacy: Constitutional Constraints and Policy Options*, 70 TEMPLE L. REV. 1, 30 (1997)). *See also Gannett Co., Inc. v. State of Delaware*, 571 A.2d 735, 755 (Del. 1990) (Walsh, J., dissenting). Although this argument is plausible, we will not conclude from a single passage of Supreme Court dicta that the question is decisively settled. Rather, we treat the question as unsettled and proceed with the "experience and logic" analysis required by *Press-Enterprise II*.

and logic" test establishes the existence of a presumptive First Amendment right of access to obtain the names of both trial jurors and prospective jurors prior to empanelment of the jury. We conclude that it does.

### 1. Experience

In *Press-Enterprise I*, the Supreme Court traced the development of the jury selection process from the days "before the Norman Conquest," and concluded that "since the development of trial by jury, the process of selection of jurors has presumptively been a public process with exceptions only for good cause shown." 464 U.S. 505–08. Although this historical evidence helps to show that *voir dire* is traditionally a public process, it does not necessarily establish that the jurors' names were also known to the public. The Media-Intervenors point out that "there is no suggestion in . . . *Press-Enterprise I* that the names of the jurors were not equally open to the public as the other parts of the *voir dire* process." Media's Emergency Motion at 11–12. This is true, but the opinion contains no suggestion to the contrary, and we are reluctant to draw conclusions solely based on the Court's silence about a question that was not before it.

Because juries have historically been selected from local populations in which most people have known each other, however, the traditional public nature of *voir dire* strongly suggests that jurors' identities were public as well. Case law

32

and legal commentary confirm this suggestion. *See In Re Baltimore Sun Co.*, 841 F.2d 74, 75 (4th Cir. 1998) ("When the jury system grew up with juries of the vicinage, everybody knew everybody on the jury . . . ," so requiring the public disclosure of the names of trial and prospective jurors upon empanelment is "no more than an application of what has always been the law . . . .")[25]; David Weinstein, *Protecting A Juror's Right to Privacy: Constitutional Constraints and Policy Options*, 70 TEMP. L. REV. 1, 30 (1997) ("The names of jurors have been available to the public throughout the history of the common law. . . . Moreover, the records of early jury trials evince little concern for protecting juror anonymity."); Robert Lloyd Raskopf, *A First Amendment Right of Access to a Juror's Identity: Toward a Fuller Understanding of the Jury's Deliberative Process*, 17 PEPP. L. REV. 357, 370 (1990) ("An examination of historical tradition indicates that jurors' identities and places of residence traditionally have been known to the public."). We find it significant that instances of courts withholding jurors' names appear to be very rare before the 1970s. *See, e.g.*, Ephraim Margolin & Gerald F. Uelmen, *The Anonymous Jury: Jury Tampering By Another Name?*, 9 CRIM JUST. 14, 14 (1994) ("Juror anonymity is an innovation that was unknown to the common law and to American jurisprudence in

---

[25] The Fourth Circuit's *Baltimore Sun* opinion ultimately rests on the common law rather than on the First Amendment. 841 F.2d at 76 n.4. Nonetheless, its historical evidence is useful for our analysis of the "experience" prong.

33

its first two centuries."). Neither the District Court nor the Government cite any such cases in their discussion of the "experience" prong. *See* Dec. 21 Order at 26; Government's Response at 16–18. Moreover, none of the federal and state opinions that analyze the "experience" prong have cited any pre-1970s cases in which jurors' names were not publicly known prior to empanelment. *See, e.g.*, *United States v. Black*, 483 F. Supp. 2d 618, 623–26 (N.D. Ill. 2007); *Commonwealth v. Long*, 922 A.2d 892, 901–03 (Pa. 2007); *Beacon Journal v. Bond*, 781 N.E.2d 180, 193 (Ohio 2002); *Gannett Co., Inc. v. State of Delaware*, 571 A.2d 735, 743–48 (Del. 1990). Such cases exist,[26] but they are rare.[27] Based on the evidence before

---

[26] For example, in *Hamer v. United States*, 259 F.2d 274 (9th Cir. 1958), the Ninth Circuit upheld a 1951 order of the United States District Court for the Southern District of California that prohibited revelation of the names and addresses of jurors and prospective jurors to anyone, including the defendant, prior to trial. *Id.* at 277–80.

[27] We agree with the observation of the dissenting judge in *Gannett Co.*, 571 A.2d at 757–58, that even if a few cases exist in which courts kept jurors' names private, this would not by itself prove that no tradition of openness exists. In that judge's words:

> One cannot conclude with certainty that in the entire history of Anglo-American jurisprudence an anonymous jury was *never* impanelled [*sic*] prior to the 1970s. Yet

34

us, it appears that public knowledge of jurors' names is a well-established part of American judicial tradition.

The Government's strongest argument that there is no such tradition of openness is based on 28 U.S.C. § 1863(b)(7), which instructs District Courts to put into effect a jury selection plan that will

> fix the time when the names drawn from the qualified jury wheel shall be disclosed to parties and to the public. *If the plan permits these names to be made public*, it may nevertheless permit the chief judge of the district court, or such other district court judge as the plan may provide, to keep these names confidential in any case where the interests of justice so require.

28 U.S.C. § 1863(b)(7) (2000) (emphasis added). When

_____

> the majority appears to demand that degree of certainty before it would be willing to recognize a tradition of openness. Rather than requiring Gannett to show that a strong presumption of openness exists, the majority would ask it to prove that restrictions have never and could never have been imposed. By contrast, the United States Supreme Court has never required such an impossible standard of proof.

571 A.2d at 757–58 (Walsh, J., dissenting).

35

Congress enacted this provision in 1968, the accompanying legislative history explained that it "permits the present diversity of practice to continue. Some district courts keep juror names confidential for fear of jury tampering. Other district courts routinely publicize the names." *See In re Globe Newspaper*, 920 F.2d 88, 92 (1st Cir. 1990) (quoting H.R. Rep. No. 1076, 90th Cong., 2d Sess., *reprinted in* 1968 U.S.C.C.A.N. 1792, 1801). The Government argues that the statute and this passage from its legislative history suggest that, at least as of 1968, no strong tradition of juror name disclosure existed. Government's Response at 16–17.

We are reluctant to afford the relevant language of the statute significant weight in this context. Nothing in the statute itself indicates whether Congress believed that allowing federal courts to withhold juror names was consistent with historical practice or a significant departure. The House Report is more explicit on this point, stating that the statute was merely intended to preserve the "diversity of practice" that existed in federal courts as of 1968. But the House Report is not an official expression of Congress's views, and its persuasive value is limited because it provides no evidence to support its claim that such a "diversity of practice" existed at the time. Moreover, even if the House Report accurately characterizes the practices of federal district courts in 1968, it is nonetheless consistent with the proposition that withholding the names of jurors is a relatively recent phenomenon. Given the Supreme Court's suggestion that a proper analysis of "experience" will evaluate

36

trial practices as they have developed over the past millennium in courts at all levels, *see Press-Enterprise II*, 478 U.S. at 8, we cannot discern whether jurors' names have traditionally been public based on an assertion in legislative history forty years ago that some degree of "diversity of practice" existed in the federal system.

The reports published in 1968 and 1980 by the Committee on the Operation of the Jury System of the Judicial Conference of the United States are not to the contrary. *See* Report of the Committee on the Operation of the Jury System on the "Free Press-Fair Trial" Issue, *reprinted in* 45 F.R.D. 391 (1968); Revised Report of the Judicial Conference Committee on the Operation of the Jury System on the "Free Press-Fair Trial" Issue, *reprinted in* 87 F.R.D. 519 (1980). Both of the Committee's reports recommend that District Courts adopt a rule that allows judges, "in a case which is likely to attract unusual publicity," to issue a "special order" that "might be addressed" to a variety of subjects, including a direction that "the names and addresses of jurors or prospective jurors not be publicly released except as required by statute."[28] 45 F.R.D. at

---

[28] The dissent states that "[t]he Committee recommended that each District Court adopt a rule providing for special measures to be taken in cases likely to receive significant media attention, including" a direction that jurors' names and addresses be withheld. Dissent, *infra*, at 26. The dissent's language ("special measures *to be taken*") suggests that the Committee

37

409–11; 87 F.R.D. at 529–31.  We do not dispute that a trial judge has historically had the power to issue such an order in special cases.  We conclude only that a tradition of openness exists and that anonymous juries have been the rare exception rather than the norm.

In short, we believe that the "experience" prong of the *Press-Enterprise II* test favors a conclusion that jurors' names have traditionally been available to the public prior to the beginning of trial.  If any significant evidence to the contrary exists, we have not discovered it in our review of case law and commentary on this question.

## *2. Logic*

We next consider whether presumptive public access to jurors' names prior to empanelment "plays a significant positive role in the functioning" of the criminal justice system.  *See Press-Enterprise II*, 478 U.S. at 8.  As the First Circuit explained in *In re Globe Newspaper Co.*, the purposes served by the openness of trials and *voir dire* generally are also served by

recommended that District Courts adopt a rule *requiring* judges to withhold jurors' names and addresses in high-profile cases.  For the sake of clarity, we note that the Committee said that "[s]uch a special order *might* be addressed to *some or all* of the following subjects," including the withholding of names and addresses.  45 F.R.D. at 409 (emphasis added).

38

public access to the jurors' names:

> Knowledge of juror identities allows the public to verify the impartiality of key participants in the administration of justice, and thereby ensures fairness, the appearance of fairness and public confidence in that system. It is possible, for example, that suspicions might arise in a particular trial (or in a series of trials) that jurors were selected from only a narrow social group, or from persons with certain political affiliations, or from persons associated with organized crime groups. It would be more difficult to inquire into such matters, and those suspicions would seem in any event more real to the public, if names and addresses were kept secret. Furthermore, information about jurors, obtained from the jurors themselves or otherwise, serves to educate the public regarding the judicial system and can be important to public debate about its strengths, flaws and means to improve it. . . . Juror bias or confusion might be uncovered, and jurors' understanding and response to judicial proceedings could be investigated. Public knowledge of juror identities could also deter intentional misrepresentation at voir dire.

920 F.2d at 94. Public access to jurors' names is not without

risks. First, when the names of jurors are public, friends or enemies of a criminal defendant may find it easier to influence the jury's decision. In an extreme case, this could take the form of threats to the jurors or their family members. Second, if jurors know that the media will attempt to contact them or their families, they may resist serving on high-profile cases at all because they fear that their privacy will be threatened. Third, public knowledge of jurors' identities might actually increase the risk of misrepresentation at *voir dire*, because some jurors will be tempted to lie in order to avoid the disclosure of embarrassing information.[29]

Despite these risks, we believe that the judicial system benefits from a presumption of public access to jurors' names. A criminal jury trial vests twelve randomly-selected citizens with the power to decide the fate of someone who the state has targeted for prosecution. We cannot reconcile the Supreme

---

[29] Although these risks may be greater when the jurors' identities are made public during trial, they often exist even when the jurors' identities will remain secret until the end of trial. First, jurors might be reluctant to convict a defendant who is known to be dangerous for fear of post-trial retaliation from the defendant's friends. Second, jurors might be reluctant to serve on a jury at all if they think that they will be the subject of media attention post-trial. Third, jurors might lie during *voir dire* because they fear that, after the trial, sensitive information will be revealed.

Court's conclusion that the public has the right to see the process in which this power is exercised (*Richmond Newspapers*) and to see the process that selects those who will exercise the power (*Press-Enterprise I*), with the conclusion that the public has no right to know who ultimately exercises this power. As the First Circuit said, "the prospect of criminal justice being routinely meted out by unknown persons does not comport with democratic values of accountability and openness." *Globe Newspaper*, 920 F.3d at 98. Of course, in a given case, a risk of jury tampering or excessive media harassment may exist. But we are satisfied that district judges are well-positioned to address these risks on a case-by-case basis, and in such cases, to make particularized findings on the record "establishing the existence of a compelling government interest" and "demonstrating that absent limited restrictions on the right of access, that other interest would be substantially impaired." *Antar*, 38 F.3d at 1359 (citing *Press-Enterprise II*, 478 U.S. at 15). We do not consider these risks so pervasive as to overcome the benefits of public access. We must strike the balance in favor of presumptive public access to jurors' identities.[30]

_____

[30] We acknowledge that our conclusion in the instant case may be inconsistent with our dicta in *United States v. Scarfo*, 850 F.2d 1015 (3d Cir. 1988), in which we said that "anonymity would seem entirely consistent with, rather than anathema to, the jury concept" and that "the probable merits of the anonymous jury procedure are worthy, not of a presumption of

41

Finally, we believe that this presumptive First Amendment right of access to the identities of jurors attaches no later than the swearing and empanelment of the jury. Corruption and bias in a jury should be rooted out before a defendant has to run the gauntlet of trial. Public knowledge of the jurors' identities is desirable in part because it can deter such corruption and bias. The value of any right of access, then, can only be diminished after trial has begun, and diminished even further once a verdict has been rendered by a corrupt or biased jury.[31] We acknowledge that, in the words of the First Circuit,

---

irregularity, but of disinterested appraisal by the courts." 850 F.2d at 1023. Unlike the instant case, *Scarfo* did not involve a First Amendment challenge and did not apply the *Press-Enterprise II* test to determine whether jurors' names should be presumptively public. We do not challenge *Scarfo*'s conclusion that a district court's decisions about anonymity should be reviewed for abuse of discretion when no one has raised a valid First Amendment challenge. *See id.*

[31] The dissent claims that "[c]orruption could just as easily be rooted out post-trial as it could pre-trial." Dissent, *infra*, at 35. Although we agree that corruption *could* be rooted out post-trial, it is far more desirable to discover it pre-trial. It is neither fair nor efficient to subject a defendant to a second trial because the jury in the first trial was tainted. Moreover, post-trial discovery of corruption shakes public confidence in the validity and finality of criminal jury verdicts. Of course, we do not suggest that a public right of access to jury names is the

"stronger reasons to withhold juror names and addresses will often exist *during* trial than *after* a verdict is rendered." *Globe Newspaper*, 920 F.2d at 91 (emphasis in original). But we do not believe that these reasons are so compelling that they negate altogether the existence of a First Amendment right of access to the names during trial. Rather, a presumption of openness exists at the latest at the time of the swearing and empanelment of the jury, regardless of the fact that a judge may find "stronger reasons" for overcoming this presumption during trial.

B.

We now consider whether the District Court articulated the necessary findings and consideration of alternatives to overcome the presumption that the jurors' names should be publicly available. It provided three reasons for exercising its discretion[32] to empanel an anonymous jury; we discuss these

_____

most effective method for uncovering corruption or bias in jury selection before a trial begins. *Voir dire*, conducted by the parties and the court, has traditionally been the primary method for accomplishing this. Nonetheless, we believe that public access plays an important role in the criminal justice system by allowing the public to verify, before a trial has begun, that the trial will proceed with an impartial jury.

[32] The District Court found that the media had no First Amendment right to obtain the jurors' names, and therefore described its decision to withhold the names as an exercise of

reasons in turn.

First, the District Court said that withholding the jurors' names is necessary to prevent the media from publishing stories about them:

> First, from the prospective [*sic*] of the media, because the media requests the names and addresses of the potential jurors, if those requests were granted, there is certainly a real potential that the media would use those names (and addresses) to develop and publish stories about the prospective jurors, coupled with possible interviews of the potential jurors' family members, co-workers, and friends. The media obviously does not want the jurors' names as an intellectual exercise to file in some reporter's electronic desk drawer. If they want the names, they want to do "reporting." If the numerous excellent "investigatory" reporters in Western Pennsylvania obtain the names and home address of the jurors, detailed "background" stories, before and during the trial, are likely. The Court thus has serious concerns that the dissemination of stories about the prospective jurors (and especially the empaneled jury) would have a real

discretion that balanced "competing constitutional interests." Dec. 21 Order at 26–27.

44

> impact on the jurors' willingness to serve and, if
> selected, on the jurors' abilities to remain fair,
> unbiased, and focused on this case.

Dec. 21 Order at 28–29. The prospect that the press might publish background stories about the jurors is not a legally sufficient reason to withhold the jurors' names from the public. Although such stories might make some jurors less willing to serve or more distracted from the case, this is a necessary cost of the openness of the judicial process.[33] The participation of jurors "in publicized trials may sometimes force them into the limelight against their wishes," but "[w]e cannot accept the mere generalized privacy concerns of jurors" as a sufficient reason to conceal their identities in every high-profile case. *See Globe Newspaper*, 920 F.2d at 98. The District Court has not established that there is anything unusual about this case, aside from a locally prominent defendant, that makes the prospective jurors' hypothetical privacy concerns more compelling than usual. The District Court's statements amount to the sort of "conclusory and generic" finding that we have held to be

---

[33] The District Court appears to believe that no good can come from any story published about a juror. As we noted above, however, press investigation of jurors might be beneficial in some cases by, for example, revealing possible sources of juror bias or deterring misrepresentation during *voir dire*.

45

insufficient to overcome the presumption of openness.[34]  *See Antar*, 38 F.3d at 1363.

Second, the District Court cited the possibility that friends or enemies of Wecht would attempt to influence the jurors:

> Secondly, from the perspective of the defendant, if there is media coverage disseminating the names (and addresses) of the prospective jurors, that coverage would undoubtedly increase the risk of intimidation of those jurors as there is a probability that other individuals (not including the defendant himself) would contact those jurors in an attempt to either hurt or bolster defendant's case.  Just like the district court in the *Scarfo* case had concerns that persons hostile to defendant might have been inclined to harass the jurors, this Court also has real concerns that persons who are either hostile to, or enamored with, defendant would attempt to influence the jurors.

---

[34] Taken to its logical conclusion, the District Court's argument would allow judges to withhold the names of jurors in every case that might attract media attention.  In fact, aside from the reference to "Western Pennsylvania" reporters, any other court could copy the District Court's statement verbatim to justify an anonymous jury in any high-profile case.

46

Dec. 21 Order at 29. This explanation is insufficient to justify withholding the names in this case. Again, this is a "conclusory and generic" finding that cannot overcome the presumption that jurors' names are public information. In fact, the District Court's reasoning would justify anonymity in virtually every jury trial, whether or not it attracts media attention, since almost all defendants have friends and enemies who might be inclined to influence jurors. The District Court's citation to *United States v. Scarfo*, 850 F.2d 1015 (3d Cir. 1988), is revealing. In *Scarfo*, we noted that the defendant belonged to an "organized crime group," had ordered "several murders" (including those of a judge and a prospective witness), and had attempted to bribe judges. *Id.* at 1017. In short, specific reasons existed in *Scarfo* to believe that friends of the defendant would threaten or bribe the jurors. The District Court in this case has not provided anything closely resembling the specific reasons offered in *Scarfo*.[35]

---

[35] The District Court said in a footnote that it was "aware of the arguments made by the government regarding defendant's alleged witness intimidation," and referred to a letter that two individuals sent to the court asking that the jury be anonymous in light of threatening letters that they had received from Wecht. Dec. 21 Order at 30 n.9. But the District Court denied that it was relying on these alleged threats "as the basis for its decision to empanel an innominate jury," *id.*, and did not include any findings of fact about them in the record. Thus, even assuming *arguendo* that these alleged threats provide a justification for an

Finally, the District Court quoted extensively from a document that Wecht filed that purports to establish that he has acquired many enemies. This document points out that Wecht "has made countless cause and manner-of-death determinations" as a witness in "hundreds of homicide and other criminal trials," some of which involve "the most serious offenders of society—violent criminals," and that he remains a witness in "pending criminal homicide trials." Dec. 21 Order at 29 (quoting Defendant's Brief in Support of Motion For Clarification And/Or Modification of Trial Procedures and Scope of Exhibit and In Limine Rulings at 5, United States v. Wecht, No. 2:06-cr-00026-AJS (W.D. Pa. Dec. 4, 2007) ("Defendant's Brief")). In addition, the document says, he has participated in "high-profile" civil cases, including wrongful death actions. *Id.* at 30 (quoting Defendant's Brief at 6). As a result, many people "may harbor ill will" or "bear animus" toward Wecht. *Id.* (citing Defendant's Brief at 5–6). Moreover, the document says that Wecht's son, as a "sitting family court judge in Allegheny County . . . [,] makes judicial decisions that affect people in the most emotional and passionate areas of their lives," and that some of these people "may feel wronged as a result of his judicial decisions." *Id.* The document points out that "[t]hose individuals may find their way into Dr. Wecht's

---

anonymous jury, we cannot rely on them because the District Court was required to place "findings on the record which clearly established that closure was necessary to protect an overriding interest." *Antar*, 38 F.3d at 1361.

48

pool of jurors." *Id.*

The District Court cited the statements in this document
to support its conclusion that, unless the jury is anonymous,
Wecht's many enemies might attempt to influence jurors. (The
District Court also suggests, without citing any evidence, that
"presumably 'unknown' friends" of Wecht might also attempt
to influence the jury. Dec. 21 Order at 30.) Wecht made these
statements, however, in support of the opposite conclusion: that
the jury should *not* be anonymous because the defense and the
media must be able to ensure that Wecht's enemies do not enter
the jury pool without being detected. Defendant's Brief at 5–11.
As we have explained, one of the purposes of access to jurors'
names is to make this type of investigation possible.[36]
Moreover, the quoted statements consist largely of speculation
that people might be hostile toward Wecht; they describe no
specific instances in which Wecht's enemies or friends had

---

[36] *Voir dire* may detect prospective jurors with obvious
connections to Wecht, even if they are anonymous. But if we
accept Wecht's assertion that he has incurred the animus of
countless "friends" of those who were affected adversely by his
participation in trials, some of these connections might not be
obvious. Moreover, any person who feels passionately enough
about Wecht to threaten jurors would presumably be willing to
lie about his or her connections to Wecht during *voir dire*,
protected by anonymity, in order to earn a spot on Wecht's jury.

threatened or harassed anyone. The mere fact that people might have passionate opinions about a defendant is not enough to justify an anonymous jury. The District Court must articulate some reason to conclude that the risks that such people pose to the jurors are serious and specific enough to justify depriving the public (and, in this case, the defendant) of knowledge of the jurors' identities. Because the District Court did little more in this case than quote factual assertions that Wecht offered in *opposition* to jury anonymity, we conclude that it did not overcome the presumption in favor of disclosure.

## VI.

The Media-Intervenors also challenge the *voir dire* procedure adopted by the District Court. They contend that by using Juror Questionnaires instead of in-court *voir dire* to make "for cause" determinations until the venire has been reduced to forty prospective jurors, the District Court violates their First Amendment right of access to *voir dire* proceedings.[37] They do not request immediate access to the actual questionnaires but instead demand that the District Court conduct *voir dire* in open court in addition to using the questionnaires. Media's Emergency Motion at 4 n.1. According to the Media-

---

[37] We need not conduct an "experience and logic" inquiry into whether a public right of access to *voir dire* proceedings exists, because *Press-Enterprise I* established that this right exists. 464 U.S. at 508.

Intervenors, they seek in-court *voir dire* in order to allow public access to "information traditionally revealed during *voir dire* (juror names, area where a juror lives, employment, family, etc.)." *Id.* at 16.

We reject the Media-Intervenors' request for two related reasons. First, unlike the Media-Intervenors' request for the names of prospective jurors, the request for in-court *voir dire* is not merely a request for access to information, but a request that the District Court conduct a specific procedure *and* that the Media-Intervenors have access to that procedure. It is well-established that "the method of conducting the voir dire is left to the sound discretion of the district court." *Waldorf v. Shuta*, 3 F.3d 705, 710 (3d Cir. 1993). In a *voir dire* process involving 400 prospective jurors, we believe that a trial judge has discretion to conduct part of the process exclusively based on written questionnaires, so long as it is consistent with established procedural rules (e.g., FED. R. CRIM. P. 24). Second, we believe that our order requiring the District Court to release the names of prospective jurors grants the Media-Intervenors most of the relief they seek. Because the prospective jurors will not be anonymous, the Media-Intervenors will have available information to investigate and detect possible improper bias in "for cause" determinations, should they elect to do so.

VII.

In sum, we have articulated in this opinion the reasons

51

supporting our January 9 Order vacating the provisions of the District Court's order that restricted access of Media-Intervenors and defense counsel[38] to the jurors' names.

---

[38] Suffice it to say, the fact that the accused here supports the Media-Intervenors' appeal—which often is not the case, *see, e.g.*, *ABC, Inc.*, 360 F.3d at 98–99; *Black*, 483 F. Supp. 2d at 620—bolsters the result we reach today.

United States v. Wecht, No. 07-4767

VAN ANTWERPEN, Circuit Judge, *concurring in part and dissenting in part*.

Although I seldom find it necessary to dissent, I write separately today because the Majority's opinion ignores a substantial volume of case law, statutes passed by Congress, and the established practices of many of this country's courts. Today's opinion will undoubtedly cause significant problems and delays in our district courts if the Majority's expansion of the collateral order doctrine and its announcement of a new constitutional right are permitted to stand.

I dissent from the Majority's holding that this Court has jurisdiction at this time to entertain the Media-Intervenors' motion and that the Media-Intervenors are entitled, as a matter of constitutional right, to the names of all of the prospective and trial jurors prior to the empanelment of the trial jury.[39]

---

[39] In this opinion, I adopt the Majority's use of the terms "prospective jurors," which refers to the members of the venire, and "trial jurors," which refers to the members of the venire who are chosen to compose the actual trial jury.

I also note that the jury in this case is not "anonymous," as the parties will know everything about the jurors, including their names and other personal information, and the public will know everything about the jurors except their names. The

Additionally, I disagree with the remedy fashioned by the Majority, as in my opinion it amounts to impermissible micro-management of procedures and decisions that are properly delegated to the discretion of district judges.[40]

I.

According to the Majority, this Court has jurisdiction

---

District Court was therefore correct in referring to this jury as "innominate," rather than "anonymous." Furthermore, there has been no indication that the trial jurors' names will not be released following the trial.

[40]I join the Majority's holding that the District Court's use of the questionnaires for jury selection is permissible. I am also of the view that the names of those prospective jurors not selected for jury service should be disclosed once the trial jury is seated. Obviously, such disclosure is contingent on the ability of the parties to keep the names of the prospective jurors confidential, and the District Court should take the actions necessary to ensure the parties do keep the names confidential. The time and manner of disclosure is within the discretion of the District Court, however; it is not constitutionally mandated. Additionally, the unique circumstances of this case likely justify withholding the names of the trial jurors at least until the end of the trial. Insofar as the Majority opinion suggests that the District Court has the discretion to make these disclosures, I join that part of the opinion.

over the Media-Intervenors' motion by virtue of the collateral order doctrine. In light of the narrow nature of the collateral order doctrine and the narrow issue presented in the instant case, I respectfully disagree.

*A.*

Collateral orders, those orders that "finally determine claims of right separable from, and collateral to, rights asserted in the action," are a narrow exception to the rule of finality,[41] and are thus reviewable on an interlocutory basis. *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949); *see also Bines v. Kulaylat*, 215 F.3d 381, 384 (3d Cir. 2000). This Court considers a district court's decision to be a reviewable collateral order if it meets all of the criteria set forth by the Supreme Court: (1) the order must "conclusively determine the disputed question;" (2) the order must "resolve an important issue completely separate from the merits of the action;" and (3)

---

[41]As a general rule, this Court has jurisdiction to hear appeals only from final decisions of the district courts. *See* 28 U.S.C. § 1291; *see also Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 545 (1949) (noting that 28 U.S.C. § 1291 "provides . . . for appeal only 'from all final decisions of the district courts,' except when direct appeal to this Court is provided"); *Bines v. Kulaylat*, 215 F.3d 381, 384 (3d Cir. 2000) ("As a general rule, we have no jurisdiction under 28 U.S.C. § 1291 to review interlocutory orders. . . .").

55

the order must "be effectively unreviewable on appeal from a final judgment." *See Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468 (1978); *see also Youngblood v. DeWeese*, 352 F.3d 836, 838 n.1 (3d Cir. 2003).

As both the Supreme Court and this Court have emphasized on numerous occasions, the collateral order doctrine should be construed narrowly, lest this exception to the final judgment rule swallow the rule itself. *See*, *e.g.*, *Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 868 (1994) (describing the collateral order doctrine as "narrow" and "stringent"); *We, Inc. v. City of Philadelphia*, 174 F.3d 322, 324 (3d Cir. 1999) ("We have followed [the Supreme Court's] admonition and consistently construed the collateral order exception narrowly. . . .").[42] In defining what orders fall within the narrow scope of the collateral order doctrine, the Supreme

---

[42]Judge Aldisert also expressed concern with the ever-expanding scope of the collateral order doctrine in *Borden Co. v. Sylk*, 410 F.2d 843, 845-46 (3d Cir. 1969): "We have detected what appears to be an irresistible impulse on the part of appellants to invoke the 'collateral order' doctrine whenever the question of appealability arises. Were we to accept even a small percentage of these sometime [sic] exotic invocations, this court would undoubtedly find itself reviewing more 'collateral' than 'final' orders." The flood of motions related to this case that we have faced and continue to face bears witness to the wisdom of Judge Aldisert's words.

56

Court noted that the collateral order doctrine's "reach is limited to trial court orders affecting rights that will be irretrievably lost in the absence of an immediate appeal." *Richardson-Merrell, Inc. v. Koller*, 472 U.S. 424, 430-31 (1985).

In criminal cases, this Court must be even more vigilant in ensuring that the collateral order exception is construed narrowly, as we have been cautioned by the Supreme Court to apply the collateral order exception "with the utmost strictness" in such cases. *See Midland Asphalt Corp. v. United States*, 489 U.S. 794, 799 (1989); *Flanagan v. United States*, 465 U.S. 259, 265 (1984). Such a strict construction is necessary to avoid delays due to piecemeal appellate litigation, as these delays may work to the detriment of the rights of the defendant or prejudice the prosecution's ability to prove its case. *See United States v. MacDonald*, 435 U.S. 850, 853-54 (1978) (noting that "[t]he rule of finality has particular force in criminal prosecutions because 'encouragement of delay is fatal to the vindication of the criminal law'"); *see also Gov't of Virgin Islands v. Rivera*, 333 F.3d 143, 150 n.16 (3d Cir. 2003) ("In the context of a criminal case, the collateral order doctrine is used sparingly because of the need to effectively and efficiently conclude criminal proceedings, without piecemeal interruptions."). Accordingly, interlocutory appeals in criminal cases are permitted under the collateral order doctrine only in the most rare and exceptional circumstances. *See Flanagan*, 465 U.S. at 270.

57

*B.*

In light of this Court's practice of construing the collateral order doctrine narrowly, the appeal of the District Court's December 21, 2007 order ("December 21 Order"), which set forth the procedures for selecting the jury, is not one of the "rare" circumstances in which this Court should grant interlocutory review. Appellate review is not justified at this time because the District Court's order does not satisfy either the first or the third prong of the *Coopers & Lybrand* test.[43] *See We*, 174 F.3d at 324 ("If the order at issue fails to satisfy any one of [the *Coopers & Lybrand*] requirements, it is not an appealable collateral order.").

*1.*

The first prong of the *Coopers & Lybrand* test requires that the order at issue "conclusively determine the disputed question." *See Coopers & Lybrand*, 437 U.S. at 468. As the Majority correctly notes, this prong of the test is akin to the requirement that the order being appealed be a final order; we will not review an order that is "tentative, informal or incomplete." *See Cohen*, 337 U.S. at 546. The District Court's December 21 Order sets forth what it considered to be the

_____

[43]The Majority's thorough analysis of the second prong is correct because the issue of jury selection is sufficiently separate from the merits to satisfy this prong.

58

finalized procedures for selecting the jury. Although the December 21 Order purports to be a "final order" on the issue of jury selection, it was only one step in a process of modifications and could have been further modified by the District Court up until the time the procedures were actually implemented. Such modifications of trial procedures are clearly within the ample discretion of the District Court. *See, e.g., Waldorf v. Shuta*, 3 F.3d 705, 710 (3d Cir. 1993) (noting that "the method of conducting the voir dire is left to the sound discretion of the district court," and that "[b]ecause voir dire determinations 'rely largely on . . . immediate perceptions,' district courts have been awarded ample discretion in determining how best to conduct the voir dire"). Thus, the December 21 Order did not become a "final order" for the purposes of our review until the process set forth in the Order was actually implemented.[44]

---

[44]At the very least, the District Court should have been given the opportunity to make further modifications in light of the Media-Intervenors' arguments. A better method for challenging these procedures prior to empanelment would have been by way of a stay with an initial application to the District Court. *See* Fed. R. App. P. 8(a). The Media-Intervenors' motion to this Court was for such a stay, or, in the alternative, for summary reversal. Because the Majority granted reversal, it considered the motion for a stay to be moot. As explained in this opinion, reversal of the District Court is inappropriate at this time. Likewise, the motion for a stay of jury selection should have been denied, as the Media-Intervenors did not make that motion before the District Court, nor did they sufficiently allege

As the Majority correctly suggests, the mere fact that an order *could* have been modified does not mean the order is not final. *See* Maj. Op., *supra*, at 19 n.14; *see also Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 11-13 & n.14 (1983). As the Supreme Court stated in *Mercury Construction*, "[t]he reasoning of *Coopers & Lybrand* [that some orders that may be subject to revision are not final orders] does not reach all pretrial orders that are formally subject to revision, but only those as to which some revision *might reasonably be expected* in the ordinary course of litigation." *See id*. at 12 n.14 (emphasis added). Given that district courts have significant discretion in fashioning the manner in which a trial will be conducted, it is entirely reasonable and foreseeable that orders establishing jury selection and trial procedures will be subject to modification at any time and for any reason prior to the time the trial actually commences. Thus, the fact that the District Court issued its December 21 Order relating to jury selection almost three weeks before jury selection was set to begin belies the Majority's contention that this order was set in stone.

Although the Majority suggests that the record does not reveal any evidence that the District Court contemplated modifying the Order between December 21 and the beginning of jury selection, the record is replete with evidence that the

why such an application to the District Court would have been impracticable. *See* Fed. R. App. P. 8(a).

District Court had previously been more than accommodating in developing and modifying the procedures for jury selection from the time it first announced those procedures on July 14, 2006.[45] Because the District Court worked with the parties to develop the jury selection procedures, and because the District Court had significant discretion to modify the order prior to jury selection, it is not reasonable to presume that the December 21 Order was

---

[45] Between July 14, 2006, the date of the original jury selection order, and December 21, 2007, the date of the most recent jury selection order, multiple changes were made to the prescribed process, including: having the Court Administrator, as opposed to the Judge, sign the letter to prospective jurors following an objection by Wecht; having the jurors complete the forms in court, as opposed to at home; including in the District Court's initial order (July 14, 2006) a notation that the proposed plan was subject to modification; opening up the process to the public by including in-court *voir dire* once the venire of 400 has been culled down to 40; releasing the jury questionnaires to the media following the trial; and accommodating the numerous questions submitted by the parties for inclusion in the questionnaire, which was developed during numerous conferences with the parties. In short, the facts do not support the contention that the District Court is so set in its procedures that contemplating modification would be unreasonable. There is nothing on the record or discussed in the Media-Intervenors' brief that suggests the District Court would not have considered accommodating a request to further modify the procedures, had such a motion actually been made.

the final word on jury selection. If anything, the record indicates that had the Media-Intervenors or the defendant first attempted to seek relief from the District Court, they may well have been successful. Additionally, if the Media-Intervenors or the defendant had petitioned the District Court for modification of the December 21 Order, instead of immediately coming to this Court for relief, there would at least be some evidence on the record as to the District Court's inclination to modify the Order. No such attempt was made, however, and thus no evidence exists as to whether the District Court contemplated modification of the December 21 Order.[46] *See* Maj. Op*., supra*, at 19 n.14.

Because the Media-Intervenors have not met their burden of demonstrating that the December 21 Order "conclusively determined" the procedures for selecting the jury,[47] they cannot

---

[46]The Majority suggests that the December 21 Order was final because the District Court ruled against the Media-Intervenors on their previous objections to the Order. This fact alone does not demonstrate that the District Court did not contemplate *any* modification to the December 21 Order; it only suggests that the District Court was unlikely to accommodate the specific modifications requested by the Media.

[47]The party asserting this Court's jurisdiction over an appeal or a motion *always* has the burden of demonstrating that such jurisdiction exists. *See, e.g., Samuel-Bassett v. Kia Motors America, Inc.*, 357 F.3d 392, 396 (2004) ("The party asserting

satisfy the first prong of the *Coopers & Lybrand* test at this time.

jurisdiction bears the burden of showing that at all stages of the litigation the case is properly before the federal court."). Thus, the Media-Intervenors must point to some evidence that the District Court *did not* contemplate modification of any aspect of the December 21 order, other than suggesting that the District Court was unlikely to modify the December 21 Order merely because it had ruled against the Media-Intervenors in the past. As noted above, the Media-Intervenors cannot satisfy their burden of demonstrating that jurisdiction exists. The evidence that the District Court had previously modified the opinion multiple times and the fact that the District Court has the discretion over trial procedures suggest that it is unreasonable to presume that the December 21 Order was final at any point prior to the beginning of jury selection.

As the Majority correctly notes, the Government suggested that it was not going to contest the first prong of the *Press-Enterprise II* test. *See* Maj. Op., *supra*, at 19-20. However, as the Majority correctly notes, this failure to contest that issue is in no way dispositive of the issue before us: whether collateral order jurisdiction is appropriate. *Id*. at 20 n.15. The Government's response should not be read in such a way as to construe its failure to explicitly contest the issue as a concession. *See* Government's Response at 8-9 (noting that "the order regarding jury selection *may* satisfy the first requirement of the collateral order doctrine") (emphasis added). There are any number of reasons why the Government might choose not to contest this issue. Thus, although the Government's failure to explicitly brief this issue may be "notable," as the Majority suggests, it is only mildly so.

Accordingly, this Court does not presently have jurisdiction to entertain the Media-Intervenors' motion.

*2.*

As to the third prong of the *Coopers & Lybrand* test, that the right at issue be effectively unreviewable upon appeal, the Majority holds that it would be "impossible" to vindicate the public's right of access to the proceedings. *See* Maj. Op., *supra*, at 17. The Majority holds that "the potential harm caused by an improper order restricting the public's right to access to a criminal trial is not adequately redressable on appeal after final judgment, regardless of the trial's outcome." *See id*. As discussed further in Part II, *infra*, the Majority characterizes the right at issue in this appeal too broadly when it suggests this case is about the right to access the proceedings in general. What is at issue here is the right to know the names of the prospective and trial jurors *prior to the time the jury is empaneled*. The District Court's December 21 Order already gives the Media-Intervenors access to all other parts of the jury selection process. From the standpoint of jurisdiction, neither the Media-Intervenors nor the Majority today have explained why the public's interest in determining "the impartiality of key participants in the administration of justice" would be *impossible* to satisfy were all the names of the prospective and trial jurors not disclosed until after the trial is over, much less why withholding only the names of the jurors serving in the trial would pose such a problem. *See In re Globe Newspaper Co.*,

64

920 F.2d 88, 94 (1st Cir. 1990).

As the Supreme Court has noted, the rights that are generally appealable on an interlocutory basis in criminal matters are those rights "the legal and practical value of which would be *destroyed* if [they] were not vindicated before trial." *See MacDonald*, 435 U.S. at 860 (emphasis added). Such rights must be so important that they would be "'*lost, probably irreparably*,' if review had to await final judgment." *See Abney v. United States*, 431 U.S. 651, 658 (1977) (quoting *Cohen*, 337 U.S. at 546) (emphasis added); *see also Flanagan*, 465 U.S. at 265 ("The importance of the final judgment rule has led the Court to permit departures from the rule 'only when observance of it would practically defeat the right to any review at all.'"). The mere fact that contemporaneous disclosure of the names of the prospective and trial jurors would be more convenient for the Media-Intervenors does not, by itself, elevate the right to know and force the disclosure of the names of the prospective and trial jurors to such a level that the right would be destroyed or irrelevant after the trial is complete.

The issue is not, as the Majority repeatedly suggests, about the "value" of the right to know the names of the prospective and trial jurors[48] or whether that right would be

_____

[48]The fact that the media may be better able to report on trial proceedings were they given contemporaneous access to the names of the jurors, as opposed to being given access at the

65

"seriously undermined."[49]  *See* Maj. Op., *supra*, at 18.  Nor has the District Court here barred the courtroom doors to the Media-Intervenors or sealed transcripts of court proceedings, as was the situation in many of the right-of-access cases cited in the Majority's opinion.  *See, e.g., Press-Enterprise Co. v. Superior Court of California*, 464 U.S. 501, 503-04 (1984) ("*Press-*

---

conclusion of the trial, is not a sufficient reason to support the Majority's arbitrary line.  *See United States v. Doherty*, 675 F. Supp. 719, 725 n.7 (D. Mass. 1987) ("The Globe [newspaper], however, advances the absolutist view that it has a right to immediate access in order to satisfy the public's interest at a time when it is focused on the most dramatic stage of a jury trial - the return of the verdict.  With respect, this is little more than an argument that it wants the information to sell more papers. While this is hardly an ignoble end, it flies in the face of the historic traditions of the courts [and] does nothing to enhance the jury system. . . .").

[49]The Majority quotes the Seventh Circuit's decision in *Grove Fresh Distribs., Inc. v. Everfresh Juice Co.*, 24 F.3d 893, 897 (7th Cir. 1994), for the proposition that denying contemporaneous access to court records may have the same effect as a complete bar to access.  *See* Maj. Op., *supra*, at 18. *Grove Fresh*, unlike the instant case, involved a district court's decision to completely seal *all* court records in the case before it.  Such a complete bar to the media's access to court documents and proceedings is distinguishable from the case before us, as here the Media-Intervenors have access to a great deal of information relating to jury selection.

66

*Enterprise I*"); *Globe Newspaper Co. v. Superior Court for Norfolk County*, 457 U.S. 596, 598-99 (1982); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 559-61 (1980); *ABC, Inc. v. Stewart*, 360 F.3d 90, 93 (2d Cir. 2004); *United States v. Antar*, 38 F.3d 1348, 1350-51 (3d Cir. 1994) . The only question underlying our ability to exercise our jurisdiction is whether the right of the public to know the names of the prospective or trial jurors would be *virtually impossible* to exercise were the names disclosed after the trial, as opposed to before it. The answer to that question is undoubtedly "no," as nothing in the case law or commentary cited by the Majority indicates that knowledge of the names of prospective or trial jurors is only effective prior to the beginning of the trial.

The Majority relies in part on *Sell v. United States* and *Flanagan v. United States* in holding that the right at issue in this case is reviewable on an interlocutory basis. Both of these cases are distinguishable, however. In *Sell*, the defendant sought interlocutory appeal of an order requiring that he be forcibly medicated in order to stand trial. *See Sell v. United States*, 539 U.S. 166, 171-75 (2003). Upon review of this order, the Supreme Court held that were the Court to wait to review Sell's appeal of the order requiring forcible administration of the anti-psychotic drugs until after the trial, it would be impossible to vindicate Sell's right to not be forcibly medicated in order to stand trial. *See id*. at 176-77 ("By the time of trial Sell will have undergone forced medication – the very harm that he seeks to avoid. He cannot undo that harm even if he is acquitted.

Indeed, if he is acquitted, there will be no appeal through which he might obtain review."). Accordingly, the Supreme Court held that Sell's appeal was permissible as an interlocutory matter. *See id*. at 177. In *Flanagan*, the issue before the Supreme Court was whether an order disqualifying the defendants' counsel was appealable as a collateral order. *See Flanagan*, 465 U.S. at 261-63. The Supreme Court held that it was not, as post-conviction review of the alleged deprivation of the defendants' right to choose their own counsel was effective in ensuring that their rights were not violated.[50] *See id*. at 266-68. In its opinion, the Supreme Court recited the very limited number of orders that are reviewable as interlocutory appeals in criminal cases: an order denying a motion to reduce bail, an order denying a motion to dismiss an indictment on double

---

[50]In so holding, the Court analogized the right at issue in *Flanagan* to deprivations of the Sixth Amendment right to counsel, which, the Court noted, is fully reviewable even after the trial. *See Flanagan*, 465 U.S. at 268 (citing *Gideon v. Wainwright*, 372 U.S. 335 (1963)). In effect, the Majority's holding today that the Media-Intervenors' request to know the names of the prospective or trial jurors is reviewable as a collateral order seemingly suggests that the right to know the names of the jurors is more important and more fleeting than is the defendant's right to be represented by counsel. *See, e.g., Smith-Bey v. Petsock*, 741 F.2d 22, 26 (3d Cir. 1984) (noting that orders denying appointed counsel, whether in civil or criminal cases, are only reviewable after final judgment has been entered).

jeopardy grounds, and an order refusing to dismiss an indictment for violation of the Speech and Debate Clause.  *See id*. at 266; *see also* Maj. Op., *supra*, at 15-16.

Neither the order at issue in *Sell* nor the various orders listed in *Flanagan* as reviewable are similar to the order at issue in the instant case.  In *Sell*, once the defendant was medicated, his ability to prosecute his appeal was lost, as there was no remedy a court could give him once the medication order was carried out.  Similarly, as the Supreme Court noted in *Flanagan*, once a duplicitous prosecution of a defendant begins, the right to be protected from being twice put in jeopardy is useless.  In contrast, the Media-Intervenors do not lose the right to know the names of the jurors once the trial begins, nor does the public lose the ability to observe the participants in the judicial process once the trial commences.  Both rights are effectively enforced post-trial; the mere fact that knowing the names of the prospective or trial jurors earlier rather than later is preferable does not, by itself, mean that the right to gather, use, and process the information requested by the Media-Intervenors is completely and irretrievably lost once the trial commences.[51]

---

[51]In fact, most of the cases cited by the Majority arise from the media's *post-trial* challenges to the denial of access to information, including transcripts of proceedings that were initially closed.  *See, e.g., Antar*, 38 F.3d at 1350-51; *In re Globe Newspaper*, 920 F.2d at 90.  Such cases clearly establish that the right to access can be effectively contested and satisfied

69

Accordingly, the District Court's order is not effectively unreviewable post-trial.[52]

---

post-trial. Accordingly, these cases do not support the Majority's suggestion that the District Court's order is effectively unreviewable post-trial. Furthermore, none of these cases held that the claims of post-trial access were rendered moot by the completion of the trial, thus suggesting that the right *is* effectively reviewable at a time other than prior to empanelment.

[52]The Supreme Court has classified the rights that are "effectively unreviewable" on appeal, and therefore reviewable on an interlocutory basis, as those that would be "practically defeat[ed]" were they not enforced pre-trial, those that are "impossible" to vindicate on post-trial appeal, those that are "destroyed" by the commencement of trial, and those that would be "lost . . . irreparably" once the trial commences. This language indicates just how important and fleeting a right must be in order to qualify under the collateral order doctrine. *See Flanagan*, 465 U.S. at 265; *MacDonald*, 435 U.S. at 860; *Abney*, 431 U.S. at 658. The interest in knowing the names of the jurors and the right of the public to have access to and oversee the judicial process would not be "impossible" to vindicate post-trial, as the Majority alleges, nor would these rights be "destroyed" by the commencement of trial. They may be diminished in value once the trial begins or more convenient if exercised pre-trial, as the Majority suggests, but this is insufficient to warrant the exercise of our jurisdiction under the narrowly-construed collateral order doctrine.

70

Because the Media-Intervenors' interest in knowing the names of the prospective and trial jurors is not destroyed by the commencement of jury selection and the trial, the Media-Intervenors' appeal fails to satisfy the third prong of the *Coopers & Lybrand* test, and we are therefore without jurisdiction to hear this appeal.[53]

*D.*

The Majority today errs in holding that we have jurisdiction over the Media-Intervenors' appeal. The order contested by the Media-Intervenors is not a final order that conclusively resolves the jury selection issue, nor is the public's right to know the names of the prospective or trial jurors destroyed by the commencement of the trial. Although the Majority is correct that *some* right of access claims[54] are only

---

[53]If anything, the Majority opinion today will result in an avalanche of appeals, as the media can now argue that virtually any district court order that hinders their ability to report in the manner they choose is a violation of the First Amendment. Such a result will not only unduly burden this Court and delay the trial process, it will conflict with the Supreme Court's command that the collateral order doctrine is to be construed narrowly. As has previously been noted, we have already had to deal with numerous appeals and motions in this case.

[54]As noted in Part II, *infra*, I cannot join the Majority's holding that the First Amendment right of public access to

71

effectively enforced contemporaneously, the Majority is incorrect in holding that the media's interest in knowing the names of prospective or trial jurors is reviewable as a collateral order because it can only be vindicated prior to the selection of the jury.[55] The collateral order doctrine is reserved for only the most rare of circumstances, and the issue raised by the Media-Intervenors in this case is not so rare or extraordinary as to warrant creating a new class of collateral orders. Accordingly, the Media-Intervenors' appeal should be denied for lack of this Court's jurisdiction over the District Court's jury selection order.

## II.

Assuming *arguendo* that we have jurisdiction over this matter on an interlocutory basis, the Majority errs in holding that

---

criminal proceedings necessarily includes a right to know the names of the prospective and trial jurors before the trial even begins.

[55]Although there are decisions of this Circuit that hold that certain restrictions on the right to access are appealable as final orders, those cases dealt with *complete* closures of the proceedings or a court's refusal to unseal certain records. *See, e.g., United States v. Smith*, 123 F.3d 140, 145 (3d Cir. 1997); *Antar*, 38 F.3d at 1350-51. The circumstances of those cases are unlike the very limited restriction on the media's access in this case, and thus we are not bound by those distinguishable cases.

the First Amendment requires the District Court to disclose the identities of the prospective and trial jurors to the Media-Intervenors prior to the empanelment of the trial jury. It is well-established that the First Amendment protects the right of the public, and the media as its proxy, to have access to criminal proceedings and to gather information. *See Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 576-77 (1980). As the Majority correctly notes, this right protects public and media access to numerous facets of the trial process, including *voir dire*. *See* Maj. Op., *supra*, at 28 (citing *Press-Enterprise I*, 464 U.S. at 508). The question presented in this appeal is not whether the media has a right of access to Dr. Wecht's *voir dire* proceedings, however. The question is far more narrow: whether the First Amendment right of access necessarily includes a constitutional right to know the names of prospective and trial jurors prior to the empanelment of the trial jury. The Majority concludes that the right of access includes a constitutional right to know the identities of all jurors, which in turn requires disclosure by the District Court before the trial begins.

The Majority is incorrect that "access" necessarily includes the identities of the prospective and trial jurors. Additionally, the First Amendment does not require disclosure of the names to the media prior to the empanelment of the trial jury.

*A.*

73

The Majority employs the "experience and logic" test set forth in *Press-Enterprise Co. v. Superior Court of California*, 478 U.S. 1, 8-9 (1986) ("*Press-Enterprise II*"), to determine whether the Media-Intervenors are entitled, as a matter of constitutional right, to force the District Court to divulge the names of the prospective and trial jurors prior to the empanelment of the trial jury. The Majority incorrectly concludes that this two-prong test requires disclosure, as the *Press-Enterprise II* test does not yield such an entitlement.

*1.*

The first part of the *Press-Enterprise II* test, the "experience" prong, requires an examination of "whether the *place and process* have historically been open to the press and general public." *See Press-Enterprise II*, 478 U.S. at 8 (emphasis added). According to the Majority, the public has historically had a right to know the names of prospective jurors. In support of this conclusion, the Majority cites the Supreme Court's historical analysis in *Press-Enterprise I*, in which the Court noted that "since the development of trial by jury, the process of selection of jurors has presumptively been a public process with exceptions only for good cause shown." *Press-Enterprise I*, 464 U.S. at 505-08. Although the Majority acknowledges that the *Press-Enterprise I* opinion mentions nothing about whether the identities of prospective jurors were historically available to the public, and although *Press-Enterprise I* deals only with the *complete closure* of *voir dire*

74

proceedings, the Majority nonetheless infers that the *Press-Enterprise I* historical analysis suggests that the names of jurors were also known to the public. The Majority reaches this critical conclusion despite the Supreme Court's silence on this important question[56] and based solely on the assumption that because *voir dire* was traditionally open to the public, the names of jurors must also have been common knowledge. *See* Maj. Op., *supra*, at 32-33. For this reason, according to the Majority, the Media-Intervenors can force the District Court to disclose the names of the prospective and trial jurors before the trial begins.

A review of the case law, legislation, and local court procedures of the courts in our Circuit and that of a variety of other jurisdictions reveals that the "right" to know the names of the jurors is not, as the Majority suggests, clearly defined. If anything, a more thorough review of historical and modern jury

---

[56]The Majority wisely notes that it is "reluctant to draw conclusions solely based on the [Supreme] Court's silence about a question that was not before it." *See* Maj. Op*., supra*, at 32. Accordingly, the Majority refuses to infer that a tradition of openness existed. It then throws that caution to the wind and holds that, based on the Supreme Court's general statements about the public nature of the *voir dire* process, none of which addresses the issue of whether the identities of jurors were known to the public, the names of jurors were historically known to the general public. *See id* at 32-33.

practices suggests that the "experience" is one of giving discretion to district judges over the conduct of *voir dire*, including the discretionary ability to withhold the names of prospective and trial jurors.

*i.*

In 1968, following the Supreme Court's decision in *Sheppard v. Maxwell*, 384 U.S. 333 (1966),[57] Congress passed

---

[57] In *Sheppard*, the Supreme Court admonished the trial court for not protecting the rights of the defendant by insulating the jury from prejudicial publicity. The Supreme Court noted the tremendous burden placed on the participants of the trial by the extensive media coverage. *See Sheppard*, 384 U.S. at 342-45. The Court pointed out that although "[t]he press does not simply publish information about trials but guards against the miscarriage of justice by subjecting the police, prosecutors, and judicial processes to extensive public scrutiny and criticism," some limits could be placed on the media to ensure that the trial process proceeds fairly. *Id*. at 349-51. In holding that the jury may have been unfairly influenced by the media coverage, the Supreme Court noted that the jurors "were subjected to newspaper, radio and television coverage of the trial while not taking part in the proceedings." *Id*. at 353. The Court emphasized that all of the names and addresses of the veniremen were published in the newspapers, and that "anonymous letters and telephone calls, as well as calls from friends, regarding the impending prosecution were received by all of the prospective

76

a law addressing the concerns raised by the Supreme Court about the pervasive nature of modern media coverage and its effect on the judicial process. The law, codified at 28 U.S.C. § 1863(b)(7), permits the district courts to develop their own individual jury selection plans. *See* 28 U.S.C. § 1863(b)(7); *see also* 28 U.S.C. § 1867(f) (permitting courts to withhold the contents of records relating to jury selection). These plans, if the district courts so choose, may permit the individual judges to keep the names of prospective and trial jurors "*confidential in any case where the interests of justice so require.*" *See* 28 U.S.C. § 1863(b)(7) (emphasis added). The legislative history of the statute explains that the statute was intended to permit "the present diversity of practice around the nation to continue. Some district courts keep juror names confidential for fear of jury tampering. Other district courts routinely publicize the names." *See In re Globe Newspaper,* 920 F.2d at 92 (quoting H.R. Rep. No. 1076, 90th Cong., 2d Sess., *reprinted in* 1968 U.S.C.C.A.N. 1792, 1801)). Not only does this statute indicate that the experience of the last 40 years supports giving the district courts great discretion in determining whether to release the names of jurors, it also suggests that there was a significant amount of such discretion *prior to* 1968, which the statute attempted to codify and preserve. Despite its recognition that this statute is strong evidence that no tradition of openness

jurors." *Id*. at 342. The Court also noted that pictures of the prospective jurors appeared in the newspaper during the course of jury selection. *See id*. at 343.

77

existed, the Majority brushes aside the statute, and with it the informed judgment of Congress, suggesting that it should not be given significant weight in determining whether there is an historical right to know the names of the jurors. *See* Maj. Op., *supra*, at 36-37.

The jury selection procedures employed by various jurisdictions in implementing 28 U.S.C. § 1863(b)(7) further undercut the Majority's argument that the "experience" prong supports a determination that the names of jurors were historically available to the media as a matter of right. Following the passage of 28 U.S.C. § 1863(b)(7), numerous jurisdictions across the country implemented, and continue to employ, jury selection plans that permit individual judges to keep the names of jurors confidential. *See, e.g.*, D. Ariz. L.R. Crim. P. 57.2(f)(5); D. La. L. Crim. R. 53.10(E); D. Minn. L.R. 83.2(c)(5); D.N.D. L.R. 77.3(E)(5); N.D. Okla. L. Crim. R. 57.3(A)(5); D.P.R. L. Civ. R. 83.7(g)(5); W.D. Wash. L. Crim. R. 53(c)(5). Most of the district courts in our Circuit have developed and continue to employ similar plans. *See* United States District Court for the Eastern District of Pennsylvania, Jury Selection Implementation Plan, at ¶ 9(a), *reprinted in* Peter F. Vaira, Eastern District of Pennsylvania Federal Practice Rules Annotated 653 (2003); Juror Selection Plan, United States District Court for the Middle District of Pennsylvania §§ 503, 904, http://www.pamd.uscourts.gov/stando/89-69.pdf (revised Aug. 5, 1999); *In re Jury Administration Procedures*, Misc. 06-211 (W.D. Pa. July 13, 2006),

78

http://www.pa.wd.uscourts.gov/Documents/Forms/jury_06-211.pdf (July 13, 2006); Revised Jury Plan of the United States District Court for the District of Delaware for the Random Selection of Grand and Petit Jurors, at ¶ 8, http://www.ded.uscourts.gov/jury/juryplan.pdf (amended Apr. 10, 2002); Plan of Implementation of the United States District Court for the District of New Jersey Pursuant to the Jury Selection and Service Act of 1968, at ¶ I, http://www.njd.uscourts.gov/jury/JURY-PLAN-FINAL-1-31-03-apprv.pdf (revised November 1, 2002).

*ii.*

In addition to the plans developed by the courts in this Circuit and those of other jurisdictions, all of which codify a practice of giving the trial court judge discretion whether and when to release the names of prospective and trial jurors, the Judicial Conference of the United States has studied and reported on the issue of how to protect trials from undue influence and harassment by media coverage. In 1968, following "approximately two years of deliberation and research" by various committees and subcommittees of the Judicial Conference on "the necessity of promulgating guidelines or taking other corrective action to shield federal juries from prejudicial publicity," the Committee on the Operation of the Jury System ("Committee") released its report and findings. *See* Report of the Committee on the Operation of the Jury System on the "Free Press-Fair Trial" Issue, *reprinted*

79

*in* 45 F.R.D. 391, 392 (1968) ("1968 Report"). In that report, the Committee noted that with regard to the media, "it is clear that the court has the power and the duty to regulate the conduct of a trial so as to insulate the proceedings from prejudicial influences." *Id*. at 401. The Committee recommended that each District Court adopt a rule providing for special measures to be taken in cases likely to receive significant media attention, including a "[d]irection that the names and addresses of jurors or prospective jurors not be publicly released except as required by statute." *Id*. at 410-11. The Committee noted that an such an order would be consistent with the "traditional" practices of controlling potentially prejudicial publicity. *See id*. at 412-13.

In 1976, the Judicial Conference authorized the Committee to review the 1968 Free Press-Fair Trial Guidelines and determine whether any amendments were necessary.[58] *See* Revised Report of the Judicial Conference Committee on the Operation of the Jury System on the "Free Press-Fair Trial" Issue, *reprinted in* 87 F.R.D. 519 (1980). Several years later, in its 1980 report, the Committee reaffirmed its support for giving district courts the freedom to develop special orders relating to the conduct of jury trials. *See id*. at 529-30. The Committee maintained the same language concerning such orders as that in the 1968 Guidelines. *See id*. As was the case in 1968, the Committee again noted the ability of the district courts to issue

---

[58]The chairman of the subcommittee that studied these issues was Third Circuit Chief Judge Collins J. Seitz.

80

orders directing that the identities of prospective and trial jurors not be released. *See id*. at 529-31. Additionally, the Committee recommended that district courts "make more extensive use of existing techniques designed to ensure an impartial jury," which included withholding the names of prospective and trial jurors.[59] *Id*. at 533-35.

*iii.*

Various decisions of courts from a variety of jurisdictions, including many of the cases cited by the Majority, have also suggested that keeping the names of prospective and trial jurors confidential is a viable option for dealing with potentially prejudicial media exposure. *See, e.g., Press-Enterprise I*, 464 U.S. at 512 ("Even then a valid privacy right may rise to a level that part of the transcript [of the *voir dire* proceedings] should be sealed, *or the name of a juror withheld*, to protect the person from embarrassment.") (emphasis added); *Stewart*, 360 F.3d at 104-05 ("First, we do not see why simply concealing the identities of the prospective jurors would not have been sufficient. . . . Here, partial closure was an available and an effective means of ensuring the candor of prospective jurors."); *Gannett Co., Inc. v. State of Delaware*, 571 A.2d 735, 751 (Del. 1989); *see also Hamer v. United States*, 259 F.2d 274

---

[59]The Committee's recommendations are also discussed in Edward Devitt, et al., 1 *Federal Jury Practice and Instructions: Civil and Criminal* § 4.05 (4th ed. 1992).

81

(9th Cir. 1958) (upholding trial court's refusal to release the names of jurors to anyone, including the defendant, against the defendant's Sixth Amendment challenge). Moreover, numerous courts have used or upheld the use of anonymous juries or anonymous *voir dire* in cases where media exposure or other prejudicial influences might be a problem. *See United States v. Brown*, 250 F.3d 907, 916-17 (5th Cir. 2001) (upholding refusal to grant post-trial access to juror identities and noting that an anonymous jury is preferable to sequestration because "[a]nonymity protects, in addition to the jurors, the venire persons and the jurors' families from influence exerted by outside parties"); *United States v. Branch*, 91 F.3d 699, 724 (5th Cir. 1996); *United States v. Wong*, 40 F.3d 1347, 1377 (2d Cir. 1994) (noting that the "prospect of publicity militates in favor of jury anonymity to prevent exposure of the jurors to intimidation or harassment"); *United States v. Scarfo*, 850 F.2d 1015, 1023 (3d Cir. 1988); *United States v. Black*, 483 F. Supp. 2d 618, 623-26 (N.D. Ill. 2007) (refusing to release names of empaneled jurors to the media); *United States v. Doherty*, 675 F. Supp. 719 (D. Mass. 1987) (releasing names and addresses of jurors seven days after the conclusion of the trial). Courts have also suggested that the media's request to know the identities of the prospective and trial jurors can be adequately satisfied by post-trial release of the transcripts of the *voir dire* proceedings, thus suggesting pre-trial disclosure is not mandatory. *See, e.g., Press-Enterprise I*, 464 U.S. at 512 ("When limited closure is ordered, the constitutional values sought to be protected by holding open proceedings may be satisfied later by making a

82

transcript of the closed proceedings available within a reasonable time, if the judge determines that disclosure can be accomplished while safeguarding the juror's valid privacy interests."); *In re Globe Newspaper*, 920 F.2d at 91-93, 98 (permitting juror identities to be withheld prior to trial but ordering post-trial release in light of district court's failure to adequately justify decision to withhold).

*iv.*

The nature of trial practice has undoubtedly changed over the last few decades, let alone the last millennium.[60] In

---

[60]In particular, it is worth noting that at the origin of the jury system, jurors were selected based on their knowledge of the parties, their prior knowledge of the facts of the case, or their affiliation with one of the parties. *See, e.g.,* Valerie P. Hans and Neil Vidmar, Judging the Jury 21-44 (1986) (discussing the evolution of the modern American jury and noting that "our present conception of justice and the role and functions of the jury have sharply changed over the centuries"); Paula DiPerna, Juries on Trial: Faces of American Justice 21-98 (1984) (discussing the evolution of the jury system and the *voir dire* process). In addition, during the early days of the jury system, jurors were selected from a much smaller area and subset of society. The changes of the composition and purpose of the jury system suggest that more recent experience is far more valuable in evaluating the role of the public in the judicial process than is earlier experience.

particular, the presence of the media, and its increased role as the surrogate of the public's interest in ensuring the justice system functions in a fair and effective way, has presented courts with new challenges as they attempt to balance the interests of the media, the public, the defendant, the Government, the jury, and the courts. *See Sheppard*, 384 U.S. at 362 (discussing the "pervasiveness" of the modern media). Given the increased media presence and role in judicial proceedings, the collective experience of courts over the last few decades in managing high-profile trials is arguably more relevant than is the early development of the jury system on which the Majority bases its holding that jurors names were known to the public as a matter of experience. The Majority either marginalizes or completely ignores recent developments in the law and recent decisions that codify existing practices, and much of the evidence the Majority ignores indicates that the right to force disclosure of the names of jurors is not rooted in either history or practice. The Majority's conclusory statement that jurors' names were known to the public throughout history is further undercut by the statements of Congress and the Judicial Conference of the United States. These bodies, after considerable review of trial court practices as they have developed over the course of history, came to the conclusion that it is permissible for the individual district courts to withhold the names of prospective and trial jurors. The fact that numerous district courts and state courts, exercising their own individual judgment in light of the challenges their judges face, permit the names of jurors to be withheld is strong additional

84

evidence that the "right" the Majority announces today is not firmly rooted in history or the collective experience of this nation's courts.[61]

Despite its admonition that any analysis of the "experience" prong of *Press-Enterprise II* must necessarily include the experience as it has developed over the last millennium,[62] the Majority largely ignores the last half-century

---

[61]Presumably, the Majority would have us believe that 28 U.S.C. §§ 1863(b)(7) and 1867(f) are arguably unconstitutional to the extent they restrict the media's right to know the names of the jurors in all but the most unusual of cases. Furthermore, the Majority's holding calls into question the practices of numerous federal and state courts with regard to jury selection and suggests that all of those courts, including many of the district courts in this jurisdiction, are acting in contravention of the Constitution.

[62]In its discussion of the "experience" prong, the Majority cites the historical analyses in *Press-Enterprise I* and *In re Baltimore Sun Co.*, 841 F.2d 74, 75 (4th Cir. 1998). Although these cases begin their examination of the history of the jury system in the days "before the Norman conquest," nothing in either case or in *Press-Enterprise II* explicitly supports the Majority's suggestion that the whole millennium's worth of experience must be considered. Even if the whole millennium is considered, it makes sense to consider the right in question in context; thus, questions about media access to trials are more properly examined in light of recent history, when the media

of this millennium. The experience over the past half-century, in the context of media outlets that gather information and report twenty-four hours a day, seven days a week, has largely been one of granting increased discretion to district courts in the management of their trial procedures, not one of forcing complete openness. I believe that the courts' collective experience over the last half-century is *highly* persuasive, especially in light of the increased presence of the media and the facts of this case. This experience is not, as the Majority suggests, somehow less persuasive. Accordingly, a properly-conducted analysis of the "experience" prong does not result in a finding that the names of jurors were historically known to the public, and by extension the media, as a matter of right.

*2.*

The "logic" prong of the *Press-Enterprise II* test requires courts to evaluate whether "public access plays a significant positive role in the functioning of the particular process in question." *Press-Enterprise II*, 478 U.S. at 8. The Majority holds that logic dictates that knowing the names of the jurors prior to empanelment of the trial jury "plays a significant positive role in the functioning" of the criminal justice system. *See* Maj. Op., *supra*, at 38. Accordingly, the Majority holds, the District Court must disclose the names of the prospective and trial jurors prior to the empanelment of the jury as a matter of

became much more pervasive.

constitutional right. The logical considerations underlying the right of access do not require, as a matter of constitutional right, the pre-empanelment disclosure of the jurors' names.

The purpose of the "logic" prong is to determine whether "the historical practice play[s] 'an essential role' in the proper functioning of government . . . since otherwise the most trivial and unimportant historical practices . . . would be chiselled in constitutional stone." *See In re Reporters Comm. for Freedom of the Press*, 773 F.2d 1325, 1332 (D.C. Cir. 1985). Indeed, not every historical practice that plays a positive role in the judicial process is considered a constitutional right. As the Supreme Court has noted, the logic test allows courts to "distinguish between what the Constitution permits and what it requires." *Gannett Co., Inc. v. DePasquale*, 443 U.S. 368, 385 (1979). Put another way, the question is whether announcing the names of the jurors prior to empanelment is significantly important to the public's ability to oversee the jury selection process and to ensure the judicial system functions fairly and effectively. *See also In re Reporters*, 772 F.2d at 1332 (noting that the process in question must play "an essential role").

In determining whether a claim of access satisfies the "logic" test, this Court has set forth a number of factors to consider. These factors include:

> [P]romotion of informed discussion of governmental affairs by providing the public with

87

the more complete understanding of the judicial system; promotion of the public perception of fairness which can be achieved only by permitting full public view of the proceedings; providing a significant community therapeutic value as an outlet for community concern, hostility, and emotion; serving as a check on corrupt practices by exposing the judicial process to public scrutiny; enhancement of the performance of all involved; and discouragement of perjury.

*United States v. Smith*, 123 F.3d 140, 146-47 (3d Cir. 1997). As has been noted above, the question in this case is not whether the media has a right to access the *voir dire* proceedings; that right has been clearly established in the case law. The actual question presented to us is whether the media is entitled as a matter of constitutional right to know the names of both the prospective and trial jurors *prior to the empanelment of the trial jury*. A review of the Media-Intervenors' demand under the *Smith* factors does not support the conclusion that knowing juror names prior to their empanelment is included in the right of access protected by the First Amendment.

Neither the Majority nor the Media-Intervenors explains why informed discussion or understanding of the judicial

process can only take place pre-trial.[63] Corruption could just as easily be rooted out post-trial as it could pre-trial. In addition, rather than making jurors more likely to be candid in their answers during *voir dire*, knowing that their personal lives and opinions will be exposed to the public by the media will more likely make jurors *less* willing to serve and less candid in their responses. *See In re South Carolina Press Assn.*, 946 F.2d 1037, 1044 (4th Cir. 1991) ("[T]he potential jurors will be more candid in their responses if they do not have to worry about what the public's opinion of those responses might be."); *see also Stewart*, 360 F.3d at 104 ("[W]e do not see why simply concealing the identities of the prospective jurors would not have been sufficient to ensure juror candor."). Suggesting that prospective jurors will be less than candid or will perjure themselves absent media scrutiny is entirely too cynical a view of the judicial process and its participants. *See Gannett*, 571 A.2d at 750 ("Gannett's fairness argument is based on the presumption that jurors will not respond truthfully, and therefore, the public requires further safeguard, which it is claimed only the press can provide. We refuse to adopt such a cynical view of the criminal justice system."). Thus, the *Smith*

_____

[63]If anything, it would seem that knowing how the jury ruled would put the public in a better position to decide whether the judicial process functioned appropriately. Prior to the actual verdict, the public can only speculate about how the jurors will rule and whether something in their personal lives will affect their verdict.

89

factors do not dictate the result the Majority reaches today.

In addition to considering the benefits of public access to the names of the jurors,[64] we must also consider the potential dangers of public access. *See North Jersey Media Group, Inc. v. Ashcroft*, 308 F.3d 198, 217 (3d Cir. 2002) (noting that "to gauge accurately whether a role is positive, the calculus must perforce take account of the flip side – the extent to which openness impairs the public good," and that "were the logic prong only to determine whether openness serves some good, it is difficult to conceive of a government proceeding to which the public would not have a First Amendment right of access"). Requiring district courts to bow to media demands to know the names of prospective jurors would certainly impair the public good in many cases. Although the media may desire this information for the avowed purpose of opening the judicial

---

[64]In discussing the benefits of openness, the Majority states that it "cannot reconcile the conclusion that the public has the right to see the process in which this power [to decide the fate of a defendant] is exercised . . . and to see the process that selects those who will exercise the power . . . , with the conclusion that the public has no right to know who ultimately exercises this power." Maj. Op., *supra*, at 41. The question is not whether the public *ever* has a right to know who sits in judgment of a defendant in the vast majority of cases, however, but whether that right to know is only logically exercised, as the Majority suggests, *prior* to the commencement of the trial.

90

process to public scrutiny, the media will likely use the information it possesses for the purpose of writing stories about the prospective jurors. In order to gather further information, there is a strong possibility that the media will make contact with the prospective jurors or their families and friends before the trial begins. Such reporting may require significant and unwarranted invasions of the privacy of the jurors, none of whom had a choice about being called to service. Furthermore, it stands to reason that it is more likely that the parties or their enemies will be able to exert influence over the jurors were they to know their identities. Finally, knowing that jury service will result in potential harassment and invasions of their privacy, citizens will likely be more reluctant to serve and less likely to be candid during jury selection. Thus, requiring pre-empanelment disclosure of the identities of prospective jurors raises significant concerns about hindering the public interest in fair and orderly trials presided over by unbiased jurors.[65] This,

---

[65]The District Court's concerns about juror harassment by the media are somewhat justified by the experience of the Delaware courts in *Gannett*:

Gannett, nevertheless, immediately published an article in the midst of trial highlighting the names and giving profiles of individual jurors. Apparently, this was the first newspaper article in Delaware to publish such information while a trial was in progress. The article admitted that the "jurors value[d] their privacy highly and became

ironically, is the very danger the right of access seeks to avoid.

In light of the foregoing analysis, the Majority's argument that the right of access necessarily includes the right to have the identities of the prospective and trial jurors

> extremely upset when a ... television crew followed some of them to lunch and attempted to film them eating." Further, it stated that the jurors "avoid[ed] media, family members of the victims and defendant, and anyone else who appear[ed] recognizable, leaving local restaurants at the sight of a familiar face from the courtroom." The article then continued with detailed profiles of the jurors, giving their names, hometowns, occupations, marital status, number and ages of their children, personal mannerisms and appearance. The latter portrayals were rarely flattering. Jurors were described as having a "stern expression", a "stern demeanor", "stylishly dressed", "admits to a hearing problem", "stout", "mostly bald", "short and round", and "tall, balding and thin."

*Gannett*, 571 A.2d at 738.

I do not mean to suggest that the present Media-Intervenors would consider acting in the same manner as Gannett. *Gannett* merely demonstrates the *possible* disruption that pre-trial disclosure of jurors' names to the media may cause were the media to act inappropriately, and clearly the Media-Intervenors cannot presume to predict what other media sources may do.

92

announced to the public prior to the empanelment of the trial jury fails to pass the *Press-Enterprise II* logic test. There is no logical support for the line the Majority draws when it requires disclosure as a matter of constitutional right prior to the empanelment of the trial jury.[66] *See, e.g., United States v. Edwards*, 823 F.2d 111, 120 (5th Cir. 1987) (noting that the "usefulness of releasing jurors' names appears to us highly questionable"). The potential that pre-empanelment disclosure will hinder the judicial process, whether by tainting the jury, making it more difficult to select an uninformed jury, or subjecting the jurors to harassment and depredation, far outweighs the benefit to the public of knowing the names of the prospective and trial jurors prior to the commencement of the trial.[67] Accordingly, I do not believe that logic supports the

---

[66]In fact, many of the cases cited by the Majority concern *post-trial* access to the identities of jurors, which suggests that logic does not require the arbitrary pre-empanelment line drawn by the Majority today. *See, e.g., Press-Enterprise I*, 464 U.S. at 512; *In re Globe Newspaper*, 920 F.2d at 91-93.

[67]Determining whether the "logic" prong mandates a First Amendment right of access to the names of the jurors prior to the trial is admittedly a speculative analysis that requires a balancing of the theoretical benefits and detriments of pre-trial release. However, such an analysis of the theoretical benefits and detriments is required by the Supreme Court. If anything, the foregoing analysis makes a strong case that the decision whether to release the names of the prospective jurors should be

constitutional rule announced by the Majority: that courts must disclose the names of prospective and trial jurors to the media prior to empanelment as a matter of constitutional law.

*B.*

Two cases from other jurisdictions are instructive, although not binding, with regard to the question of whether the First Amendment right of access includes a right to force a district court to disclose the identity of the prospective jurors. Both *United States v. Black*, 483 F. Supp. 2d 618 (N.D. Ill. 2007), and *Gannett Co., Inc. v. State*, 571 A.2d 735 (Del. 1990), addressed factual and procedural circumstances virtually identical to those presented in this appeal.

*1.*

*Black* involved a high-profile criminal fraud prosecution. In that case, the district court, recognizing the intense media coverage of the trial, held anonymous *voir dire* in open court but entertained the peremptory challenges at sidebar. *See Black*, 483 F. Supp. 2d at 620-21. Following jury selection, the district court disclosed the names of the empaneled jurors and the

---

left to the measured discretion of the trial judge, who is in the best position to determine whether disclosure, in light of the particular facts of the case, will be more beneficial than detrimental to the public good.

94

alternates to the parties, but it did not release that information to the media. *Id*. at 621. The media filed a motion to compel the district court to release the names of the jurors and alternates prior to trial. *Id*. at 620.

After engaging in an extensive discussion and analysis of the *Press-Enterprise II* factors, the district court denied the motion. *See id*. at 622-30. According to the district court, not all aspects of the criminal trial process are protected by the First Amendment's right of access. *See id*. at 622 (citing circuit court decisions holding "that the First Amendment does not guarantee access to withdrawn plea agreements, affidavits supporting search warrants, or presentence reports"). The court noted that the issue in *Black* was not whether the media had a right of access to the *voir dire* proceedings, as that question was settled, but whether experience and logic dictated that the media had a constitutional right to learn the names of jurors before a verdict was rendered. *See id*. at 624. After reviewing decisions and opinions from other circuit and district courts, all of which upheld varying degrees of restriction on the media's access to the names of prospective jurors, the district court determined that analyzing the voir dire process in light of the "experience" prong of *Press-Enterprise II* did not result in a finding that the media had a constitutional right to the names of the jurors prior to the conclusion of the trial. *See id*. at 626. The district court in *Black* also held that the "logic" prong of the *Press-Enterprise II* test did not establish a constitutional right. In particular, the district court noted that open access to juror names did not

95

achieve the same effect of vindicating the public's right to oversee judicial proceedings as did requiring the process itself to be available to public scrutiny. *See id*. at 628 ("But open access to juror names during the pendency of trial has no similar effect and, in fact, disclosure *enhances the risk* that the jury will not be able to function as it should, in secrecy and free of any outside influence.") (emphasis in original). Accordingly, the court in *Black* refused to release the names to the media, having found no constitutional right to know the names of the jurors prior to the conclusion of the trial.

*2.*

As in *Black*, the Delaware Supreme Court in *Gannett* had to determine if and when the Constitution requires public disclosure of the names of prospective and trial jurors. *Gannett* involved a high-profile murder case. Based on extensive publicity in the prior trial of a co-defendant and overwhelming pre-trial publicity in the case presently before it, the trial court in *Gannett* decided to withhold the names of prospective jurors from the media during *voir dire*; it permitted the parties to know the identities of the prospective jurors. *See Gannett*, 571 A.2d at 737. Much like the case before us, prospective jurors in the *Gannett* case were only identified by their assigned juror number. *See id*. The media was permitted to be present in the courtroom and to observe and report on the proceedings. *See id*. at 738. Gannett, the publisher of a state-wide daily newspaper, intervened and petitioned the trial court to release the names of

the prospective jurors prior to jury selection. *See id*. The trial court refused, and Gannett appealed to the Delaware Supreme Court. *See id*. at 739.

The Delaware Supreme Court upheld the trial court's jury selection procedures, noting that because Gannett failed to satisfy either of the *Press-Enterprise II* requirements, no qualified right to the names of the prospective jurors existed prior to jury selection. *See id*. at 751. According to the Delaware Supreme Court, the issue of whether the right of access included the right to know the names of the prospective jurors was one of first impression, as all of the cases dealing with the right of access concerned restrictions on the right to view court documents or complete closures of the courtroom. *See id*. at 741-42; *see also id*. at 742 ("To our knowledge, however, no court has yet recognized a right of access to jurors' names."). Accordingly, the Court employed the *Press-Enterprise II* test because it was the "most closely analogous basis for disposition of the matter." *Id*. The Court framed the issue in the case as: whether the "announcement of jurors' names has traditionally been open to the press and general public." *Id*. at 743. It concluded that "the historical tradition gives trial courts discretion over [*voir dire*] matters, which is reflected in express statutory provisions enacted by duly elected representatives of the people at the state and national levels." *Id*. at 748.

In addition to determining that experience weighed on the

side of giving the trial courts discretion to manage *voir dire* procedures, the Court held that announcing the names of the prospective jurors had only a tenuous and insignificant logical connection to the goals of the First Amendment's right of access. *See id*. at 751 (noting that the trial court's procedures "assured the public that the trial was fair without closing the proceedings to anyone," and that "there is nothing to suggest that such actions undermined public trust in the judicial system"). In so holding, the Court rejected the claims put forth by the defendant that announcing the names of the prospective jurors was necessary to ensure that jurors were candid in their responses to *voir dire* questioning. *See id*. at 750. Thus, the Court held, the media was not entitled, as a matter of constitutional right, to the names of the prospective jurors prior to the commencement of the trial. *See id*. at 751.

*3.*

*Black* and *Gannett* analyzed the precise question before us in virtually identical factual circumstances. Both courts concluded that the First Amendment right of access *does not* include a right to know the names of prospective and trial jurors. The courts in both cases undertook an extensive and thorough analysis of the *Press-Enterprise II* factors in reaching the conclusion that the decision to withhold the names of jurors, whether before or during the trial, is within the discretion of the trial courts. Those courts did not, as the Majority does in its opinion, merely presume that because *voir dire* is generally held

98

in public and because many years ago juries were only drawn from small communities in which people knew one another, that there must be an historical tradition of permitting the public to force disclosure of the names of prospective jurors. Accordingly, although the *Black* and *Gannett* holdings are not binding on our Court,[68] they do offer a great deal of insight as to how this Court should analyze and address the particular question before us.

---

[68]In their brief, the Media-Intervenors were quick to point out that *Black* was a district court decision, and thus entitled to little weight. As I have noted, however, almost all of the cases cited by the Media-Intervenors and the Majority deal with complete closure of the proceedings or demands for post-trial release of jurors names. Neither the Media-Intervenors nor the Majority have identified any binding authority that addresses the precise question before us: whether the media has a right under the First Amendment to force disclosure of the names of jurors prior to the empanelment of the jury. Accordingly, to the extent that the *Black* court actually reaches this precise question, its decision is entitled to no less weight than any other authority identified by the Media-Intervenors.

For the same reason, the Delaware Supreme Court's decision in *Gannett* is not to be ignored. If anything, *Gannett*'s facts and procedural posture are almost identical to those of the case before us. It is the most persuasive authority that has been brought to our attention, as it is the most on-point with the facts of the case before us.

*C.*

In conclusion, an analysis of the *Press-Enterprise II* test does not support the rule announced by the Majority today. Neither the Media-Intervenors nor the Majority has produced convincing evidence that the public has a qualified right under the First Amendment to force the disclosure of the names of both the prospective and trial jurors prior to empanelment.[69]

---

[69]The Majority suggests that we review *de novo* whether the right of access includes a right to know the names of jurors. *See* Maj. Op., *supra*, at 29 (citing *Antar*, 38 F.3d at 1356-57). However, much of the case law concerning the right of access places the burden of satisfying the experience and logic test, whether explicitly or implicitly, on the party asserting the right to access. *See, e.g., Press-Enterprise II*, 478 U.S. at 8; *North Jersey Media Group*, 308 F.3d at 209; *United States v. Corbitt*, 879 F.2d 224, 228 (7th Cir. 1989); *Black*, 483 F. Supp. 2d at 623; *Gannett*, 571 A.2d at 749. To the extent that the Majority suggests that the burden is on the Government to demonstrate that no tradition of openness exists, this is a mischaracterization of the burden. *See* Maj. Op., *supra*, at 34 n.27 ("[T]his would not by itself prove that no tradition of openness exists."). The standard is either *de novo* or the burden is on the Media-Intervenors to satisfy the *Press-Enterprise II* test; the burden is not on the Government to prove the inapplicability of the *Press-Enterprise II* factors. Regardless of which standard is used, however, the claim of a right to access the names of jurors prior to the trial fails to satisfy the *Press-Enterprise II* test.

100

The Majority's analysis of whether there is an historical practice of revealing the names of prospective and trial jurors prior to the empanelment of the trial jury largely ignores the suggestions of Congress and the Judicial Conference, as well as court practices of at least the last half-century. In addition, the Majority relies on cases granting the media *post-trial* access to juror names for the proposition that the media is entitled to the names of the jurors *prior to* the trial, a conclusion that does not follow from the cited authority. Finally, the Majority offers little to support its conclusion that the public's desire to know the names of jurors prior to the beginning of the trial plays such an important role in the proper functioning of the judicial process that the media is entitled to force pre-trial disclosure despite the trial court's determination that anonymity is in the best interests of the parties and the judicial system. Simply because pre-empanelment disclosure may play a positive role in some cases does not, by itself, make that role so significant that pre-empanelment disclosure is required by the Constitution. *See Gannett*, 571 A.2d at 745 ("Merely because an historic procedure exists, does not automatically enlarge it to constitutional proportions.").

The names of jurors are neither a "place" nor a "process," and the history of *voir dire*, especially over the last half-century, has been one of increased discretion on the part of the district courts. Neither "experience" nor "logic" suggests that jurors have to be known to the public prior to the beginning of the trial in order for the judicial system to function properly and fairly. If anything, the anonymity of prospective and trial jurors, especially in high profile cases, is *more* consistent with the proper and fair functioning of the judicial process. *See Scarfo*, 850 F.2d at 1023 ("Because the system contemplates that jurors

101

will inconspicuously fade back into the community once their tenure is completed, anonymity would seem entirely consistent with, rather than anathema to, the jury concept.").[70] Accordingly, I cannot join the Majority's holding that the media has a constitutional right to know the names of the prospective and trial jurors, and that this right must be vindicated prior to the empanelment of the jury.

## III.

The Majority's analysis of *Press-Enterprise I* and *Press-Enterprise II* leads it to the conclusion that the ability of the media to force disclosure of the identities of the prospective and trial jurors is protected as part of the First Amendment right of access. Even if I agreed that this analysis was correct, which I do not, I would hold that the reasons given by the District Court in its December 21 Order were sufficient to permit the District Court to temporarily withhold the names of the prospective and trial jurors.

### *A.*

As this Court has noted, the media's First Amendment

---

[70]*See also Scarfo*, 850 F.2d at 1023 ("As judges, we are aware that, even in routine criminal cases, veniremen are often uncomfortable with disclosure of their names and addresses to a defendant. . . . If . . . jury anonymity promotes impartial decision making [in high-profile cases], that result is likely to hold equally true [even] in less celebrated cases.").

right to have access to trial proceedings is not absolute.[71] *Smith*, 123 F.3d at 147. It is, rather, a presumptive right that can be overcome where there is a compelling reason to close the proceedings or withhold the information. *See Press-Enterprise I*, 464 U.S. at 509 (requiring the district court to show cause "that outweighs the value of openness"). As the Supreme Court suggested in *Press-Enterprise I*, a district court must place sufficient and compelling reasoning on the record such that "a reviewing court can determine whether the closure order was properly entered." *See id*. at 510. In light of the Supreme Court's jurisprudence in this area, it is necessary to determine whether there is a compelling reason for the actions taken by the District Court and whether those actions are narrowly tailored to achieve the goals of the District Court. *See Antar*, 38 F.3d at 1359.

*1.*

The District Court had a number of concerns in mind when it prepared its jury selection order. The District Court expressed a great deal of concern about the harassment that the

---

[71]As the Supreme Court acknowledged, some parts of the judicial process may need to be temporarily shielded from the scrutiny of the media in order to protect the rights of the defendant or the rights of the jurors. *See Press-Enterprise I*, 464 U.S. at 509. Certain parts of the process, such as sidebar discussions or private discussions between the parties in chambers, have been historically conducted away from the public. In addition to the common practice in courts, the United States Code also protects information and records used by the clerk of courts in connection with the jury selection process. *See* 28 U.S.C. § 1867(f).

jurors, as well as their families, friends, and co-workers, would face were their identities known to the media prior to the trial. The District Court also noted that its reluctance to release the names of the jurors prior to empanelment of the jury was based, in part, on the effect that such media exposure would have on the ability to select a jury that would be fair, impartial, and willing to serve.[72]  As this Court has noted, a fair and impartial jury is an essential part of our system of justice.  *See Gov't of Virgin Islands v. Riley*, 973 F.2d 224, 226 (3d Cir. 1992) ("It is axiomatic that one of the fundamental rights a defendant possesses is the right to a fair trial before an impartial,

---

[72]The Majority casually casts aside the District Court's concern that the Media-Intervenors want to publish stories about the prospective jurors prior to the empanelment of the jury.  In light of the prevalence of the news media in modern society and the risk that jurors could be influenced by media coverage or hindered in their ability to be impartial, I would not be so cavalier in dismissing the District Court's concerns.  It is difficult to imagine that it would be possible to pick a fair, impartial, and willing jury that has no outside knowledge of the case if the news media camps outside of the jurors' houses and questions them on their way to the courthouse.  This is not to suggest that the Media-Intervenors' motives are improper or that these particular media outlets will attempt to harass or write stories about these jurors.  Nevertheless, other members of the media could do so.  The District Court is likely correct, however: the media in general wants the names of the prospective jurors in order to publish stories about them.  Such stories will arguably require contact between the Media-Intervenors, or other members of the media, and the prospective jurors, which runs the risk of further diminishing the pool of impartial prospective jurors in a case that has already received a great deal of local, state, and national media attention.

'indifferent' jury of his peers."). Thus, protecting the jury from harassment and outside influence is essential to ensuring that the jury's verdict is free from doubt.

The District Court's concern about protecting the privacy of the jurors goes in tandem with the aforementioned concern about avoiding potential outside influences on the jury. In the December 21 Order, the District Court noted its concern about the privacy of the prospective and trial jurors given the tremendous media attention this trial has garnered. The privacy of jurors is a significant interest, as protecting that privacy is the best way to avoid harassment of the jurors. *See Press-Enterprise I*, 464 U.S. at 511-12; *see also id.* at 519 (Stevens, J., concurring) ("As the Court recognizes, the privacy interests of jurors may in some circumstances provide a basis for some limitation on the public's access to *voir dire*."). As with the concern about the potential for the Media-Intervenors to influence or deter the jury from impartial consideration of the case, however, the Majority dismisses this concern without much discussion, noting that: "The District Court has not established that there is anything unusual about this case, aside from a locally prominent defendant, that makes the prospective jurors' hypothetical privacy concerns more compelling than usual."[73]  *See* Maj. Op., *supra*, at 45. Certainly, ensuring that jurors are not harassed, influenced, deterred from service, or hindered in their ability to be honest in their answers at *voir dire*

---

[73]Arguably, the number of pre-trial motions and interlocutory appeals, the prominence of the defendant, the intervention of the media in the matter, and the significant media coverage this case has already garnered suggest that this case is far from the usual, run-of-the-mill criminal prosecution.

105

in such a high-profile criminal case[74] is a compelling reason for limiting the amount of information to which the media has access before and during the trial.[75]

---

[74]The Supreme Court discussed how jurors in another high-profile case were harassed:

> As a consequence [of publishing the names and addresses of the prospective jurors], anonymous letters and telephone calls, as well as calls from friends, regarding the impending prosecution were received by all of the prospective jurors. . . . [N]umerous pictures of the jurors, with their addresses, which appeared in the newspapers before and during the trial itself exposed them to expressions of opinion from both cranks and friends. The fact that anonymous letters had been received by prospective jurors should have made the judge aware that this publicity seriously threatened the jurors' privacy.

*Sheppard,* 384 U.S. at 342, 353.

[75]The Majority suggests, without qualification or explanation, that making the identities of the prospective jurors known to the media prior to empanelment of the jury might deter misrepresentation or reveal juror bias. Just as strong an argument can be made that allowing the media to report on the answers given by the individual jurors during jury selection would make those jurors *less* likely to be forthcoming in their answers. *See In re South Carolina Press Ass'n.,* 946 F.2d at 1044 ("[T]he potential jurors will be more candid in their responses if they do not have to worry about what the public's opinion of those responses might be."). Certainly in a case such as the instant one, which has political, religious, and cultural undertones, it is more compelling to ensure that prospective jurors are *more* open in revealing their personal biases, not less

106

The other concerns voiced by the District Court are no less compelling. The District Court considered the possibility that friends or enemies of Dr. Wecht might attempt to harass or influence the jury were the identities of the prospective and trial jurors known to the public before and during the trial. Dr. Wecht is a prominent political figure in western Pennsylvania, and many may perceive this prosecution as politically-motivated. Dr. Wecht has testified in hundreds of trials regarding causes of death, and his testimony has frequently led to findings of guilt or liability. He is a prominent commentator and writer as well, as the letters to the editor included in the record reveal. Although Dr. Wecht is not of the same ilk as the organized crime figures in cases such as *United States v. Scarfo*, he is nonetheless a prominent and controversial figure. Given his position as a prominent political figure and an elected official, it is entirely possible that there are members of the public who have an interest is seeing a particular outcome in this case.[76] In addition, Dr. Wecht stands to be deprived of his

---

open, as will likely be the result of the Majority's decision to grant the Media-Intervenors unlimited pre-trial access to the identities of the prospective and trial jurors.

[76]Both the Majority and Dr. Wecht acknowledge that he has enemies that might be interested in seeing that he is found guilty. *See* Maj. Op., *supra*, at 49 ("Wecht made these statements [concerning the possibility that his enemies might attempt to influence the jury] in support of the opposite conclusion: that the jury should *not* be anonymous because the defense and the media must be able to ensure that Wecht's enemies do not enter the jury pool without being detected."). Although the Majority refers to this portion of Dr. Wecht's brief in support of openness, the fact that those enemies might attempt

liberty based on the jury's verdict, so ensuring that the jury is fair and impartial, and that their verdict is free from doubt, is even more compelling in the instant case. As the District Court, and not this Court, is in the best position to judge the likelihood of potentially harmful influences on the jury, we should give the District Court's evaluation of the "local ambience" of the trial a great deal of weight when deciding whether its reasons for limiting the media's access are in fact compelling. *See Scarfo*, 850 F.2d at 1023.

*2.*

With regard to the second part of the First Amendment test, that the procedures adopted by the district court be narrowly tailored to achieve the court's stated goals, the District Court's limit on the media's access to the names of the prospective and trial jurors only before and during the trial passes constitutional muster. The District Court's restrictions on media access in this case are extremely limited. According to the District Court's order, the media is entitled to be present for all phases of *voir dire*. They are entitled to review the questions asked on the questionnaire prior to the beginning of jury selection. The challenges for cause, although made solely on the basis of the questionnaire and without the benefit of in-court questioning, will be made in open court. The parties will then interview the individual prospective jurors before making their peremptory

---

to influence the trial does not logically require that the District Court *must* disclose the names *prior to empanelment*. Additionally, it would seem to be a common sense proposition that it is much harder for non-jurors to influence the jury if they do not know who the actual jurors are.

108

challenges; this will likewise be done in open court and under the scrutiny of the media. Finally, the media will have access to the completed questionnaires following the conclusion of the trial. The media thus has access to almost every aspect of, and piece of information related to, jury selection. The only information that the media is not permitted to know before and during the trial is the identity of the individual prospective and trial jurors, as they will be referred to only by their assigned number. Thus, the District Court's restrictions are entirely different from those at issue in *Antar*, on which the Majority relies. *See Antar*, 38 F.3d at 1350 (holding that sealing of transcript of *voir dire* proceedings was improper and that the media was entitled to the complete transcripts after the trial concluded). In *Antar*, unlike this case, the media was denied access to the entirety of the *voir dire* process by virtue of the seal placed on the transcripts.[77] Here, the District Court's measures to ensure a fair and proper trial were much more narrowly tailored.[78]

_____

[77]As I noted in previous sections, almost all of the case law concerning the right of access deals with *complete* closure or post-trial denials of access to judicial records. *See, e.g., Press-Enterprise I,* 464 U.S. at 504 (discussing the fact that the trial judge held only three days of public *voir dire* hearings and closed the additional six weeks of jury selection to the public); *Antar*, 38 F.3d at 1351 (noting that although the *voir dire* proceeding was technically "open" to the public, the press was excluded based on an order from the trial judge for the purpose of freeing up additional seats).

[78]Indeed, the Second Circuit suggested that although *complete* closure of the *voir dire* process was improper, more limited closure, *including the withholding of the identities of the*

*B.*

The jury selection procedure employed by the judge in the instant matter was a compromise based on the various interests at stake: the public's interest in openness, the media's interest in knowing certain information, the defendant's interest in a fair trial, the jury's interest in privacy and being free from harassment and intimidation, and the judicial system's interest in fairness and efficiency. Certainly, the District Court could have taken other action, including sequestering the jury.[79] Sequestration, however, is "one of the most burdensome tools of the many available to assure a fair trial," and it should only be employed if there are no other, less burdensome or more effective options available. *See Mastrian v. McManus*, 554 F.2d 813, 819 (8th Cir. 1977); *see also Gannett*, 571 A.2d at 751. In the instant case, the extremely limited restrictions on media access were far more accommodating to the Media-Intervenors, as well as far less burdensome on the jurors and the court, than sequestration would have been.

In order to effectively satisfy the various, and often competing, interests of the public, the media, the defendant, the government, the jurors, and the courts, the District Court in this case chose the least restrictive means to achieve its goals when it permitted the media access to everything except the identities

---

*prospective jurors*, would pass constitutional muster. *See Stewart*, 360 F.3d at 104-06.

[79]And, of course, we would review such a decision for abuse of discretion. *See United States v. Shiomos*, 864 F.2d 16, 18 (3d Cir. 1988) (citing *Holt v. United States*, 218 U.S. 245, 251 (1910)).

of the prospective and trial jurors. The District Court clearly stated sufficiently compelling reasons to warrant some manner of protection for the jurors. The concerns of the District Court were not, as the Majority so casually suggests, merely generalized concerns about juror privacy.[80] Given the District Court's extremely narrow and temporary imposition on the Media-Intervenors, the Majority's conclusion that the District Court's actions were not narrowly tailored to protect a

---

[80]In fact, the District Court considered and made findings related to every potential risk to the jury from overexposure that the Majority articulates in its opinion. *See* Maj. Op., *supra*, at 40 ("First, when the names of jurors are public, friends or enemies of a criminal defendant may find it easier to influence the jury's decision. In an extreme case, this could take the form of threats to the jurors or their family members. Second, if jurors know that the media will attempt to contact them or their families, they may resist serving on high-profile cases at all because they fear that their privacy will be threatened. Third, public knowledge of jurors' identities might actually increase the risk of misrepresentation at *voir dire*, because some jurors will be tempted to lie in order to avoid the disclosure of embarrassing information."). The Majority's disagreement with the District Court's conclusions as to the dangers to the jury and the trial process is not by itself a sufficient reason to overturn the District Court's jury selection procedures. Although I recognize that our standard of review is less deferential to the findings of the District Court where a constitutional right to access is raised, the Majority today not only fails to defer to the District Court's evaluation of the circumstances surrounding its trial, it appears to ignore the District Court's judgment entirely.

111

compelling interest is incorrect.[81]  Accordingly, I would have upheld the District Court's jury selection order.

## IV.

The biggest problem with the Majority's holding is the nature of the remedy the Majority fashions for the alleged violation of the First Amendment.  To reverse the District Court's December 21 Order and to order the District Court to disclose the names of the prospective and trial jurors is not only premature, it improperly invades the traditional purview of the district courts.  Given the state of the law and the facts of this case, as well as the fact that the case was neither further briefed nor argued, the Majority's decision to grant the Media-Intervenors' request for reversal is not appropriate.

The Majority today redefines the contours of the well-established right of access in such a way as to now include a constitutional right to know the names of the prospective and

---

[81]As I noted in Part II, *supra*, the First Amendment does not require that the District Court disclose the names of the prospective and trial jurors prior to the empanelment of the jury. We should reserve judgment on the question of whether such a right may exist after the conclusion of the trial, as that is not the question before us.  As the District Court's order related to the conduct of the trial, a province left almost entirely to the control of the District Court, its actions should be reviewed to determine if there was an abuse of discretion.  In light of the foregoing discussion, the reasons cited by the District Court are more than sufficient to uphold its discretionary decision to withhold the names of the prospective and trial jurors during the pendency of the trial.  Thus, there was no abuse of discretion.

trial jurors even before the trial jury is seated. As discussed in the preceding sections, the law is far from clear that the right of access includes such information. There is even less support in the case law for the Majority's holding that this right to know the names of the jurors *must* be vindicated before the jury is empaneled. Despite this seeming lack of clarity, which the Majority does acknowledge, the Majority nonetheless holds that the law is so clear as to warrant vacating the District Court's December 21 Order and ordering it to divulge the names of the prospective and trial jurors. Announcing a new constitutional protection for the media's interest in learning juror identities before empanelment *without* additional briefing or oral argument on the unsettled legal question is ill-advised.[82]

The Majority also should not have reversed the District Court without giving it an opportunity to make additional findings in light of the new constitutional right announced by the Majority. The District Court clearly believed that the ability to establish such procedures for jury selection was within in its

---

[82]The Media-Intervenors' motion asked this Court for summary reversal under I.O.P. 10.6 or a stay of jury selection. Accordingly, the briefs filed by the parties addressed and focused on those questions. Both Rule 10.6 and the rules governing stays have different standards and tests than does the question before us, however. There was no additional briefing specifically focusing on the issues of whether the right of access includes a right to force the disclosure of the jurors' names and whether the right *must* be vindicated prior to the empanelment of the jury, as the Majority suggests. This Court would have benefitted from more deliberation and either additional briefing at the direction of this Court or oral argument on these questions.

discretion. There is little in the record that suggests that the District Court was aware that the media's interest in knowing the names of the prospective jurors was protected as a constitutional right, and thus it did not analyze the Media-Intervenors' motion under the more rigorous First Amendment test. Effectively, the Majority substitutes its judgment for that of the District Court, which is clearly in a better position to judge the problems that may arise. We should not micro-manage aspects of district court proceedings that are traditionally within the discretion of those courts. Simply because we might have done otherwise if we were the trial judges does not mean that the circumstances of this case do not warrant such action.[83]

---

[83] *See, e.g., Gall v. United States*, 128 S. Ct. 586, 597 (2007) ("The fact that the appellate court might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court."). Indeed, if this were a sentencing case in which a district court failed to give sufficient reasons to warrant a variance, we would vacate the sentence and remand for additional reasoning supporting such a variance. *See, e.g., United States v. Kononchuk*, 485 F.3d 199, 206 (3d Cir. 2007) (vacating the defendant's sentence and remanding for a new sentence with additional explanation after determining that the District Court's consideration and explanation of the § 3553(a) factors was insufficient). We would not, nor have we ever, remanded and ordered the district court to impose a particular sentence. *See Greenlaw v. United States*, 554 U.S. — (2008) (holding that absent government appeal or cross-appeal, appellate courts cannot *sua sponte* increase a defendant's sentence, even if the district court committed procedural error in calculating the appropriate sentence). Additionally, we would not have allowed an appeal before the district court had even imposed sentence.

As this Court has noted, "'[a] criminal trial is, even in the best of circumstances, a complicated affair to manage.'" *United States v. Rivera*, 384 F.3d 49, 55 (3d Cir. 2004) (quoting *United States v. Jorn*, 400 U.S. 470, 479-80 (1971)). By holding today that the media has a right to the identities of the jurors that attaches before empanelment, and by permitting appeals of alleged deprivations of that right on an interlocutory basis, the Majority handcuffs the district courts and makes it all the more difficult for district judges to manage the complexities of criminal trials. In effect, the Majority today elevates almost every *voir dire* procedure the media finds inconvenient to a constitutional issue. In addition, the Majority draws a line delineating when the "right" to know the identities of the jurors purportedly attaches, despite a great deal of case law and practice that suggests that no such right exists or that if the right does exist, it can be fully vindicated at a later time. And the Majority does all of this without argument or additional briefing as to whether declaring the existence of this right is consistent with traditional practices.

We should have charted a much more cautious course in light of the admittedly unclear state of the law on this question. Rather than act in so hasty a fashion and without more information and deliberation, we should have remanded the issue to the District Court for additional fact-finding in light of the newly-announced constitutional protection for access to the identities of prospective jurors. The District Court, and not this Court, is most familiar with the particular issues surrounding the conduct of the trial and the pressures facing jurors. We should give some credit to the District Court's evaluation of the "local

115

ambience" surrounding the trial of Dr. Wecht.[84]

The District Court took the actions it believed were necessary to effectively protect the various competing interests and rights implicated by such a public and lengthy trial. The District Court should not be doomed and controlled in the conduct of its trial merely because it failed to articulate clearer reasons to satisfy a standard it could not have been aware existed before today's opinion. If the refusal to disclose the names of the prospective jurors prior to the empanelment of the jury is now a constitutional violation, as the Majority's holding establishes, the District Court should have the opportunity to modify its trial procedures to comport with this new rule. [85]

V.

As I have set forth in the preceding sections, I dissent

---

[84]As we have noted, we should defer to the trial court judge's evaluation of the need to protect the jurors, as he is "on the scene and [has] a vantage point superior to ours." *See Shiomos*, 864 F.2d at 18. The Majority recognizes as much, noting that "district judges are well-positioned to address these risks on a case-by-case basis, and in such cases, to make particularized findings on the record . . . ." *See* Maj. Op., *supra*, at 41. Despite this recognition, the Majority affords the District Court almost no deference in its review of the need to protect the jurors in this case.

[85]At the very least, this Court should have deferred judgment on the issue of whether the Media-Intervenors are entitled to the names of the jurors until after the trial, at which point the interest in protecting the jurors is less persuasive.

116

from the Majority's holding on a number of grounds. I do not believe that an order setting forth trial procedures is generally appealable as a collateral order, nor do I believe that the order at issue in this case is sufficiently final such that interlocutory review is warranted. Additionally, I disagree with the Majority's analysis of *Press-Enterprise II*, as it either ignores or marginalizes a statute passed by Congress, a great deal of case law, a history of giving trial judges significant discretion over the conduct of jury selection, the recommendations of the Judicial Conference, and the practices of many of this nation's courts.

In this age of pervasive media coverage, which is necessary to ensure that the public is informed and can satisfy its duty of overseeing the judicial process, it is critical to permit district courts to do what is necessary to ensure that the judicial system functions properly. If anything, giving the district courts the discretion to keep the identities of jurors confidential for a period of time significantly advances the goal of ensuring a fair and impartial criminal justice system. *See Scarfo*, 850 F.2d at 1023; *see also Sheppard*, 384 U.S. at 362-63. The District Court's *voir dire* procedures sufficiently balance the various and often competing interests implicated by such high-profile criminal trials, and the procedures it selected are far less onerous than sequestering the jury would be. *See Gannett*, 571 A.2d at 751. I cannot support the Majority's decision to micro-manage the *voir dire* procedures of the Wecht trial by vacating the District Court's order.

In my opinion, the District Court should, in the exercise of its discretion, release the names of the prospective jurors who were not selected for the trial jury following the seating of the

117

trial jury. I hold this opinion because I believe that in light of the facts and circumstances of this case, such action would be an appropriate exercise of the District Court's discretion. With regard to the names of the actual trial jurors, the District Court is entitled to keep the names of the trial jurors confidential during the trial. I express no opinion as to whether the names of the trial jurors should be released after the trial, whether as a matter of constitutional right or the District Court's discretion, though I note that the reasons it has set forth for concealing the identities of the trial jurors become less persuasive once the trial is completed. *See Capital Cities Media, Inc. v. Toole*, 463 U.S. 1303, 1306 (1983) ("[T]he State's interest . . . in shielding jurors from pressure during the course of the trial . . . becomes attenuated after [the verdict]."). I do not mean to suggest, however, that the District Court *has* to do what I have suggested because the Constitution *requires* it. The Constitution does not, as the Majority suggests, *require* pre-empanelment disclosure; thus, the Majority's invasion of the traditional realm of the district courts' discretion is not justified.

Because I cannot join in an opinion that will cause so many problems in our district courts, that establishes a new class of interlocutory orders, that effectively creates a new constitutional right, and that sets a precedent of permitting our Court to micro-manage trial procedures established by the district courts, I respectfully dissent.

118